1

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,            )
                                   )
         v.                        )  No. 15 CR 00345
                                   )
OMEED MEMAR,                       )  Chicago, Illinois
                                   )  May 1, 2017
              Defendant.           )  3:15 p.m.

                            VOLUME 1

           EXCERPT TRANSCRIPT OF PROCEEDINGS - trial
     BEFORE THE HONORABLE HARRY D. LEINENWEBER and a jury

APPEARANCES:

For the Plaintiff:         MR. JOEL R. LEVIN,
                           Acting United States Attorney
                           BY:  MR. STEPHEN C. LEE
                                MR. KARTIK K. RAMAN
                           Assistant United States Attorneys
                           219 South Dearborn Street, Suite 500
                           Chicago, Illinois 60604
                           (312) 353-5300

For the Defendant:         STAES & SCALLAN, P.C.
                           BY:  MR. ANDREW T. STAES
                                MR. STEPHEN D. SCALLAN
                           53 West Jackson Boulevard, Suite 560
                           Chicago, Illinois 60604
                           (312) 631-3139


Court Reporter:            Judith A. Walsh, CSR, RDR, CRR
                           Official Court Reporter
                           219 South Dearborn Street, Room 1944
                           Chicago, Illinois 60604
                           (312) 702-8865
                           judith_walsh@ilnd.uscourts.gov
```

2

I N D E X

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT.......Page 7

OPENING STATEMENT ON BEHALF OF THE DEFENDANT........Page 17

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT........Page 1168

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT.........Page 1206

REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT.......Page 1261

JURY CHARGE........................................Page 1280

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JILL JAROCH | | | | |
| By Mr. Raman | 32 | | | |
| By Mr. Staes | | 41 | | |
| NEHA DAVE ROBINSON | | | | |
| By Mr. Raman | 54 | | 72 | |
| By Mr. Staes | | 60 | | |
| VIDHYA SRINIVASAN | | | | |
| By Mr. Lee | 79 | | | |
| By Mr. Staes | | 95 | | |
| DANA JOHNSON | | | | |
| By Mr. Lee | 99 | | | |
| By Mr. Staes | | 175 | | |
| MICHELE KLINE | | | | |
| By Mr. Lee | 184 | | 258 | |
| By Mr. Staes | | 238 | | 260 |
| MEGAN McMULLEN | | | | |
| By Mr. Lee | 261 | | | |
| By Mr. Staes | | 277 | | |

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| LuANN FLORES | | | | |
| By Mr. Lee | 286 | | | |
| By Mr. Staes | | 293 | | |
| JENNIFER ANN GECAS | | | | |
| By Mr. Raman | 297 | | 335 | |
| By Mr. Staes | | 324 | | |
| McDANIEL ROBINSON | | | | |
| By Mr. Raman | 340 | | | |
| By Mr. Staes | | 348 | | |
| JAMES KRUPKOWSKI | | | | |
| By Mr. Lee | 352 | | | |
| By Mr. Staes | | 372 | | |
| KELLY COMBS | | | | |
| By Mr. Lee | 390 | | 404 | |
| By Mr. Staes | | 400 | | |
| CHRISTINA GUTIERREZ | | | | |
| By Mr. Raman | 405 | | 459 | |
| By Mr. Staes | | 442 | | 464 |
| KELLIE SIEGEL | | | | |
| By Mr. Lee | 469 | | | |
| By Mr. Staes | | 498 | | |
| EDWARD VICTOR ROSS | | | | |
| By Mr. Lee | 503 | | 600 | |
| By Mr. Staes | | 564 | | |
| HOLLY LAURENT | | | | |
| By Mr. Lee | 606 | | | |
| By Mr. Staes | | 630 | | |

4

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| ASHLEY DAVIS | | | | |
| By Mr. Raman | 635 | | | |
| By Mr. Staes | | 663 | | |
| JOAN MOORE | | | | |
| By Mr. Lee | 676 | | | |
| By Mr. Scallan | | 684 | | |
| PAULINE KONTOS | | | | |
| By Mr. Lee | 696 | | | |
| By Mr. Staes | | 710 | | |
| ANNA GORDON | | | | |
| By Mr. Lee | 713 | | 767 | |
| By Mr. Staes | | 751 | | 771 |
| LINNEA KELLY | | | | |
| By Mr. Scallan | 778 | | | |
| By Mr. Lee | | 793 | | |
| LUDWIG WOLF, JR. | | | | |
| By Mr. Scallan | 812 | | 820 | |
| By Mr. Lee | | 817 | | 821 |
| LAWRENCE M. EVANS | | | | |
| By Mr. Scallan | 822 | | | |
| By Mr. Lee | | 833 | | |
| MARY KATHRYN DALEY | | | | |
| By Mr. Scallan | 840 | | 858 | |
| By Mr. Lee | | 846 | | 859 |
| DAVID J. GOLDBERG, M.D. | | | | |
| By Mr. Staes | 863 | | | |
| By Mr. Lee | | 896 | | |

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| ROBERT JOSEPH SCHWENDAU | | | | |
| By Mr. Scallan | 953 | | 968 | |
| By Mr. Lee | | 960 | | |
| THOMAS WALSH | | | | |
| By Mr. Scallan | 971 | | | |
| By Mr. Lee | | 978 | | |
| ANDERS GUSTAV NYBERG | | | | |
| By Mr. Scallan | 983 | | | |
| By Mr. Lee | | 990 | | |
| MACOL MARIE CERDA | | | | |
| By Mr. Scallan | 995 | | 1007 | |
| By Mr. Lee | | 999 | | |
| OMEED MEMAR | | | | |
| By Mr. Scallan | 1010 | | | |
| By Mr. Lee | | 1093 | | |

E X H I B I T S

| NUMBER | RECEIVED |
|---|---|
| Government Exhibit | |
| Nos. 33 and 83 | 56 |
| No. 1 | 82 |
| Nos. 6 through 9 | 102 |
| No. 5 | 105 |
| No. 11 | 111 |
| No. 21 | 111 |
| No. 31 | 111 |
| No. 41 | 111 |
| No. 51 | 111 |
| No. 61 | 111 |
| No. 81 | 111 |
| No. 43 | 112 |
| No. 53 | 112 |
| No. 84 | 112 |
| No. 2 | 114 |

| NUMBER | RECEIVED |
|---|---|
| Government Exhibit | |
| No. 3 | 114 |
| No. 32 | 121 |
| No. 34 | 129 |
| No. 82 | 137 |
| No. 86 | 142 |
| No. 42 | 154 |
| No. 22 | 166 |
| No. 12 | 168 |
| No. 62 | 170 |
| No. 52 | 172 |
| No. 97 | 236 |
| No. 23 | 270 |
| No. 96 | 322 |
| No. 71 | 356 |
| No. 72 | 356 |
| No. 95 | 427 |
| No. 91 | 679 |
| No. 92 | 683 |
| No. 74 | 690 |
| No. 213 | 1114 |
| No. 100 | 1159 |
| No. 211 | 1164 |
| | |
| Defendant's Exhibit | |
| No. 1 | 690 |
| No. 2 | 690 |
| No. 3 | 690 |
| No. 4 | 690 |
| No. 9 | 956 |
| No. 10 | 971 |
| No. 11 | 983 |
| No. 12 | 995 |
| | |
| Goldberg Exhibit | |
| Nos. 1 through 4 | 878 |

(Proceedings heard in open court.  Jury in.)

THE COURT:  You can sit anywhere you want.  You don't have to sit where you were.

All right.  Members of the jury, we're about to have opening statements.  This is the opportunity -- please be seated.  Excuse me.  This is the opportunity the lawyers have to acquaint you in advance what they expect the evidence to show during the course of the trial.  It's designed to be helpful to you because oftentimes, the evidence does not come in in a perfectly logical or chronological order, so it's helpful to have the overview so you can see the relevance of particular pieces of evidence when it comes in.

The one word of caution is, whatever the attorneys say is not in and of itself evidence.  They can only predict for you at this point what they think the evidence will show, so they cannot supply it themselves.  If at the end of the case, if you conclude that no one testified the way the lawyers said they would, then you have to follow your -- what you heard and not what the lawyers said.  But the government has the burden of proof, so the government goes first in almost every aspect of the case.

So Mr. Lee, you may give the opening statement for the government.

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

MR. LEE:  Thank you, your Honor.

Ladies and gentlemen, dermatologists are doctors who specialize in the skin and who do two kinds of treatments: Medical and cosmetic. Like other doctors, when a dermatologist sees a patient and treats the patient for medical problems such as skin cancer, the dermatologist can bill the patient's insurance provider for those treatments. But unlike other doctors, dermatologists can also treat patients, do cosmetic treatments that treat a patient's skin and make a patient's skin look nicer and do not actually deal with medical problems. Dermatologists cannot bill patients' insurance providers for these cosmetic treatments. Patients have to pay for these kind of treatments themselves.

That is the way that the healthcare system is supposed to work in terms of skin care, and that is the way that the healthcare system does work with skin care except when a dermatologist decides to make some easy money by crossing the lines and by saying that cosmetic treatments are medical treatments, and that is what this case is about.

Omeed Memar, the defendant, is a dermatologist who told patients that they could get light treatments that would make their skin look better. And he told them that their insurance provider would cover the cost of these treatments. And he did that by lying to his patients' insurance providers and by claiming that he was destroying large numbers of pre-cancerous lesions when in actuality, his staff was giving

his patients cosmetic light treatments that the patients should have paid $300 or so for themselves, month after month, sometimes over years, all the result of the defendant lying about his patients' conditions.

That is what this case is about, and that is why the defendant, Omeed Memar, has been charged with multiple counts of healthcare fraud and with multiple counts of false statements in a healthcare matter. And I'm going to talk to you for the next 15 minutes or so about a few key terms of the case, what the evidence will show over the next week or so, and the kinds of evidence that will prove the defendant guilty beyond a reasonable doubt.

Now, first, I want to talk about two key terms that you're going to hear multiple times during the course of the trial. One term that you're going to hear about is an intense pulsed light treatment, sometimes called an IPL, sometimes call a photofacial. This is a cosmetic treatment that can be performed by someone who is not a doctor, it takes about 30 minutes or so to perform and generally results in a patient's skin looking nicer. People can get these kind of treatments at the dermatologist and at other places like spas. And patients typically have to pay for those treatments themselves.

Another term that you're going to hear over the course of this trial is actinic keratosis, or AK for short.

Actinic keratosis lesions are generally scaly, crusty lesions on the skin that are usually red or brown in color. Actinic keratosis lesions can occur at all ages, but they are more common with older people who have spent significant amounts of time in the sun. Actinic keratosis lesions are precancerous lesions, meaning that they could turn into a form of skin cancer.

Now, doctors generally destroy actinic keratosis lesions by using one of several methods. They can use liquid nitrogen to freeze the lesion off. They can prescribe creams. Or they can use a procedure called photodynamic therapy that uses light to activate a special kind of medication.

IPLs and AKs: Intense pulsed light treatments, actinic keratosis. These are the two main technical terms in this case. And they are what the defendant manipulated in order to make easy money from his patients' insurance providers.

Now, I want to talk to you about how the defendant did all that and how the defendant's scheme worked from the perspective of the three main groups affected by the scheme: His patients, his employees, and his patients' insurance providers.

First, the patients. The patients came into the defendant's practice here in downtown Chicago for skin exams and to address their concerns about their skin. And the defendant examined the patients, and he diagnosed their

conditions, and he also recommended that they get intense pulsed light treatments, the IPLs.

Now, when they had been recommended the IPL treatments, some patients asked how much this would cost them. And the defendant said that the cost would be taken care of. Now, some patients were happy about this because they liked getting these light treatments, and they especially liked having their insurance provider cover the cost of these treatments instead of paying for it themselves. One patient alone, Anna Gordon, who is in her 30s, got more than 30 of these IPL treatments paid for by Blue Cross and Blue Shield and by Cigna over the course of several years, from 2007 to 2013.

Now, these patients, they were not told that they had actinic keratosis lesions all over their faces, and they were not told that the IPL treatments were intended to destroy those actinic keratosis lesions that were all over their faces; again, because the evidence will show that they did not have actinic keratosis lesions all over their faces. The patients were just told to keep coming back to the defendant's practice for a series of light treatments that would be covered by insurance.

Now, the second group: The defendant's employees. The defendant's employees accompanied him when he met with some of these patients for patient examinations. And they

were there some of the times when the defendant encouraged patients to get these IPL treatments. And when a patient was going to get a light treatment that the defendant was going to have insurance cover, he told his employees to write in the patient charts that the patients had scaly plaques all over their faces, that they had 15 or 25 such scaly plaques over their faces and that all those scaly plaques had been diagnosed as actinic keratosis lesions, even though he said nothing like that to the patients themselves.

And the defendant trained his employees, and he directed them to simply copy that information about scaly plaques and actinic keratosis lesion diagnoses into chart after chart when they came in for the IPL treatments, simply repeating his initial lie treatment after treatment.

And so every time a patient like Anna Gordon or others you're going to see came in for a light treatment, the defendant's employees wrote that the patient had scaly plaques all over their faces and that those plaques had all been diagnosed as actinic keratosis lesions even though no one actually made such a diagnosis during the course of those IPL treatments.

Third: Their insurance providers. Insurance providers like Blue Cross and Blue Shield and Cigna and Aetna, they received claims from the defendant for payment, each one claiming the defendant had provided a medically necessary

service for his patients. Specifically, with each and every claim, the defendant told his insurance -- his patients' insurance providers that, one, the patient had been diagnosed with actinic keratosis; two, that the defendant had destroyed actinic keratosis lesions on the patient's skin; and three, that the defendant had destroyed 15 or more such actinic keratosis lesions, the -- triggering the maximum payment permissible for such a service.

In reality, however, the patients did not have 15 or 25 actinic keratosis lesions or any such lesions. The patients had really just received cosmetic light treatments that were not even done by the defendant and which the patient should have paid for themselves, but because the insurance providers trusted that the defendant, a doctor, was submitting accurate claims about his patients, they paid the defendant based on those false claims, typically hundreds of dollars every time, adding up to thousands of dollars for some patients over the years.

Ladies and gentlemen, Omeed Memar broke the law by lying about his patients' conditions and by submitting false claims to his patients' insurance providers. And that is what the evidence will prove beyond a reasonable doubt.

Now, I want to talk about four of the kinds of evidence that you're going to see during this trial and that will prove the defendant guilty beyond a reasonable doubt.

First, you are going to hear from several patients including Anna Gordon and others. And these patients will come and tell you that they remember the conditions of their faces when they got the IPL treatments from the defendant's practice and that they did not have 15 or 25 scaly plaques all over their faces or let alone 15 or 25 new scaly plaques appearing on their faces after the prior IPL treatment.

They will tell you that the defendant never told them that they had precancerous lesions or actinic keratosis lesions all over their faces. And they will tell you that the defendant talked to them about these IPL treatments without ever telling them that the treatments would destroy all the precancerous actinic keratosis lesions all over their faces.

Second, you're going to hear from some of the employees who actually performed the IPL treatments and who repeated the defendant's lies at his direction in patient charts. They will tell you that they were trained by the defendant to do light treatments for two kinds of patients: Those who are paying for the treatments themselves and those who were being covered by insurance.

Now, for the patients whose light treatments were being covered by insurance, the employees will tell you that they saw the patients, they did the IPL treatments, and that the treatments for those patients were the same as the ones for the patients who were getting -- who were paying for the

treatments themselves.  And nonetheless, the employees were trained to write that these patients, the ones whose treatments were being covered by insurance, that they had 15 or 25 scaly plaques on their faces and that all the scaly plaques had been diagnosed as actinic keratosis lesions and that those plaques had been destroyed.

Third, you're going to see the patient files that falsely claimed that the defendant was destroying 15 or more actinic keratosis lesions on his patients' faces treatment after treatment.  You're going to see charts that make the patients' faces look far worse than they actually were; 15 scaly plaques all over a patient's face one day, 25 scaly plaques all over a patient's face another time.  Again, not because these patients actually had 15 or 25 scaly plaques on their faces but because the defendant had trained his staff to repeat his initial lies.

You are also going to see parts, other parts of the defendant's files, parts that contradict his lies and that help show that the defendant knew what he was doing when he put false information in patients' charts and lied to their insurance providers.  You are going to see consent forms that some patients were given when they started getting the IPL treatments showing that they were told that the IPL treatments were cosmetic treatments rather than being for destruction of actinic keratosis lesions on their faces.

Now, you're also going to see how with some patients, the defendant said things about them that weren't consistent with the treatments he was billing to insurance providers. For some patients, you're going to see them coming in for IPL treatment after -- after IPL treatment for months and years. And for some patients, you'll also see that they got so many IPL treatments that they came in for other examinations during that time with the defendant. And you're going to see charts where the defendant saw the patient, documented what he saw and diagnosed, and did not say anything about the patient having actinic keratosis lesions or anything abnormal about the patient's face even though he had been having his staff perform IPL treatments that claimed to be destroying scaly plaques on their faces before those examinations, and he continued to have his staff claim to destroy actinic keratosis lesions on their faces even after those examinations that he did.

Fourth, you're going to hear from two dermatologists. Now, one is a dermatologist here in Chicago who saw two of defendant's patients, Anna Gordon and another patient, Jill Jaroch, while they were coming to Dr. Memar to get IPL treatments. And the Chicago dermatologist's records will show that she was examining the patients during the same time period and that she never diagnosed these patients with actinic keratosis lesions all over their faces even though the

defendant kept claiming that that's what he was destroying time after time.

The other dermatologist you're going to hear from is from San Diego. Now, he did not examine any of the patients in this case, but he will explain to you what actinic keratosis actually is, that IPL treatments are cosmetic treatments, and how actinic keratosis lesions are properly treated and destroyed.

Ladies and gentlemen, all this evidence will come in one witness at a time, one document at a time. And at the end of this trial, we'll have an opportunity to stand before you and to talk about how all this evidence fits together along with the commonsense inferences that you can draw from the evidence. And by the end of this trial, all of this evidence will show beyond a reasonable doubt that the defendant lied about his patients in order to get easy money out of their insurance providers light treatment after light treatment, month after month, year after year.

And based on that evidence at the end of this trial, we'll stand before you again and ask you to return the only verdict that's consistent with all the evidence in this case, and that's guilty of -- a verdict of guilty beyond a reasonable doubt. Thank you.

THE COURT: For defense, Mr. Staes.

OPENING STATEMENT ON BEHALF OF THE DEFENDANT

MR. STAES: Thank you, Judge. Would it be okay if I moved the lectern a little bit --

THE COURT: Sure.

MR. STAES: -- so I can face the ladies and gentlemen of the jury? Thank you.

Dermatology, actinic keratosis. If you're going to get picked for a jury, at least it's something electrifying, you've got to admit. Seriously, there are fancy words, and actinic keratosis is just another word for sun damage. Mr. Lee and I are going to disagree about a great deal during this case, but I suspect that there's one thing that we will agree on, and that is, the sun is not your friend. Left unattended or unprotected, it wreaks havoc on your skin, and it renders your skin susceptible to actinic keratosis and, in turn, skin cancer which is what that turns into.

The really scary part about it is that there are 57 million Americans walking around today with actinic keratosis. Think about that. That's one out of every six of us whether we know it or not. We have this condition in our skin because of the sun that renders us vulnerable to skin cancer, and that's some pretty serious stuff.

Dr. Memar is 46 years old. He has been treating skin cancer patients, pre-skin cancer patients, cosmetic patients, helping folks out for 20 years. He is what is known as a Mohs scholar which is a special kind of dermatologist. He has

reached the level of sophistication beyond that which most reach. But he's been helping folks with this stuff for a long, long time until the charges in this case.

So what is he said to have done wrong? Well, you've just heard, I think, in a not-so-subtle way from Mr. Lee that he treated actinic keratosis in a way that the government disagrees with, says that it's wrong. They say it's ineffective. And you know, we can all have our own views of the role of government in healthcare, but when the government decides that it knows more about skin cancer than skin cancer surgeons, something's wrong.

Mr. Lee talked about IPLs in the main being not good to treat actinic keratosis. He called them photofacials. He said that he's going to put an expert on who is going to talk about how they're fine cosmetically but they don't do anything -- they don't do anything in terms of a medical problem.

And so what the government does is they reason backwards. And they say that if Dr. Memar was treating something that -- in a way that was ineffective, he must not have been treating that. If IPL is not effective for actinic keratosis, he must have been treating something else and disguising it in terms of the things that he said to the insurance carriers when he sent bills out and the patients and everybody else, but that, at the essence, is the government's

argument.

Another thing that I think we're going to agree on in this trial is that there are a lot of ways to treat actinic keratosis. There are lasers, and there are gels, and there are creams, and there is what was referred to as photodynamic therapy by Mr. Lee. We'll talk about that a little bit more.

No one is going to disagree that there's lots of things that you can do. And what that tells you is that there's no gold standard. There's no silver bullet because if there was, that's the only thing that the doctors would be using. And that's what the medical texts and journals would be saying, say, "Look, folks, actinic keratosis? No problem. This is what you use. And if you use anything else, it's not the standard of care or it must be bogus."

But there are a lot of choices. And I don't really think that there's going to be too much dispute about it. The existence of multiple choices tells you something else, and that's that doctors and researchers and scientists would continue to look maybe for that silver bullet to see if there's something better out there than what we have so far, try different things.

You know, there are a lot of side effects and downtime issues and other things downsized to the treatments that we're going to be talking about in this trial. So what some doctors might do, and Dr. Memar is one of them, is try to

find something that might treat patients either better or with less side effects. That just makes sense. That is the history of medicine in this nation.

When you have many things that can work, sometimes the choice in terms of what a given patient is going to have is a function of that patient's needs. We'll go through some of that stuff during the trial, but some of these things had a lot of downtime in terms of before you even got the treatment, sometimes many hours. Sometimes you'd have downtime of as much as a week afterwards. And, you know, if you have a patient who doesn't have that kind of spare time -- Dr. Memar had a downtown practice -- time factors are not unimportant.

Some of these things would do things to your face that would be absolutely grotesque, and if you have somebody, say, in a downtown practice who is in the business world or in the TV world or in the public where there are meetings or presentations, those kinds of things, you might not want to be showing up with a face that's looking really rugged, really rugged.

So as I said, doctors would strive to look for something that might get away from some of the bad sides, maybe do a better job. And Dr. Memar was a young, kind of a cutting-edge doctor who was interested in seeing if he could make it a little easier on patients, so he came up with an idea of using this thing called intense pulsed light.

Now, he didn't invent the concept of using intense pulsed light to treat actinic keratosis. Mr. Lee referred to photodynamic therapy which is intense pulsed light that is applied after a patient gets a gel on their face called Levulan. Okay. And nobody is going to disagree or say that that wasn't a viable way to treat actinic keratosis. But the problem was that all those bad side effects were from the Levulan.

Dr. Memar had an idea that was kind of simple. And this was in about 2004. He thought, what would happen if we tried to treat actinic keratosis without the Levulan, just with the intense pulsed light -- it's a very expensive machine -- and see what happens. And if it didn't do anything, if it didn't work, nothing was lost by it. But if it did work, you could spare your patients not only the downtime that folks in the busy downtown area could ill afford to use, probably didn't have much more time than lunch, but you could spare them the kind of gruesome side effects that the Levulan brought about. And you'll see some pictures during this trial about just what that does look like.

It turned out that Dr. Memar's idea was good because it worked. And he started using it and recommending it to a fair number of his downtown patients. But it's not just going to be Dr. Memar who is going to say that it worked. I think some of the patients are going to tell you that their

situation got better.

We're going to put a doctor on the stand named Dr. Goldberg. He's going to tell you that it works. You're going to hear about medical journals at the time and probably for the ten years afterwards lauding IPL alone as being effective. It may not be quite as effective as IPL with Levulan, but think about what the patient has been saved in terms of their face basically looking like hamburger. Okay. So there's not going to be any real debate about whether or not IPL alone is effective. It might be slightly less, but the evidence is going to be clear.

And I'd like to stop at this point to talk about something non-medical, something legal. And it's something more fundamental and more bedrock than what we've been talking about so far in terms of creams and gels and the like, and that's the burden of proof in this case. The government has the burden of proof beyond a reasonable doubt to show that every aspect of its case, in every aspect, Dr. Memar is guilty.

So the question isn't whether IPL alone is effective. It's really not. The question is whether or not the government can prove that no reasonable doctor could at all even believe that it's effective, right, because if doctors disagree about the effectiveness of a treatment, that doesn't mean that someone has acted in a criminal way. But if a

doctor could reasonably think that from what he saw, what he observed in the treatments that he administered that it was working, if you could reasonably believe that, then there cannot be guilt in terms of at least the first aspect of the government's case: That IPL is purely cosmetic, that it's a photofacial procedure as you've just heard or that it's ineffective for AK.

That burden on the government remains with the government throughout this case. Dr. Memar has the presumption of innocence. He had it when he walked into this courtroom, and it will stay with him throughout this trial until and unless the government meets its burden beyond a reasonable doubt of every aspect of it. But as to the IPL, does it work for actinic keratosis, it will never sustain that burden.

The second part of the government's case is that these patients didn't have actinic keratosis at all. Leaving aside the effectiveness of IPL, it just wasn't there. The problem is that there's not going to be evidence to support that claim. The government will say that the evidence is going to come as a threshold from the patients. The patients are going to tell you that they didn't have actinic keratosis, and what happens there is that there's this neat switching of positions where all of a sudden the chairs get mixed up, and the patient becomes the doctor. And they don't need a

dermatologist because they know everything about actinic keratosis.

On one hand, they'll say that these patients have never heard about it. On the other hand, they'll say, well, I guess they've heard enough about it to know they didn't have it. And I don't understand that, but perhaps Mr. Lee will tell you how that works.

The patients, I think Mr. Lee will also tell you or he has told you, they'll come forward and talk about, well, they didn't have the symptoms that you would find with actinic keratosis. And I think if you listen very carefully of not only to the patients but to some of the medical assistants, they will tell you that they did have those symptoms. They might not have known the fancy medical jargon for it, but that's not to say they didn't have the symptoms, and I think you can hear all of them.

The next bit of inference that the government will seek to draw is that they must not have had actinic keratosis because Dr. Memar didn't tell these people that they had actinic keratosis. What Mr. Lee didn't tell you is that most of these patients at the time of the initial diagnosis and even thereafter, we're talking about going back five or ten years. Okay. Think about that, five or ten years.

So the fact that a handful of patients who hits the stand cannot remember if a couple of words were said to them

is supposed to somehow indicate that they weren't told that and they didn't have it. And frankly speaking, I'd be surprised if you could find a handful of patients from ten years ago who could remember everything that had been said to them.

Back before cell phones, I used to get lost on a regular basis. My wife and I would go to the gas station, I'd go in for the directions, and by the time I got back to the car, I had forgotten everything that I had just been told in terms of getting out of getting lost. I would kind of shrink in the seat. My wife would go in. She wouldn't say anything to me. She knew I was an idiot. But she'd go in, she'd get the directions. That's the way memory works.

Mr. Lee and I had -- bless you. We've been talking to you, both of us, there's no secret about it, we're looking at notes, right, because for memory purposes, no matter how much we've worked on this case recently, you can't remember everything word for word. A week from now and maybe sooner if we're all lucky, you'll be hearing the closing arguments or maybe the case will be coming to an end. I guarantee you that you're not going to remember every word that Stephen or I said to you. That's how memory works.

So the idea that somebody was supposed to remember everything seven years ago, maybe seven or eight people out of, I don't know, 800 to 1,000, they found that, that doesn't

prove anything other than that the human memory is not a computer. But it really doesn't matter if patients were told that they had actinic keratosis or did not. I don't think any of the doctors are going to come in here and tell you that invariably, those would be the words that they would use with patients because it's kind of like gibberish.

What does that mean? None of us are particularly good at even pronouncing it, right. And no one had ever heard of it. It's not the way people talk, and it's not the way doctors talk. What they would say is that, "You've got something on your face that we need to take care of before it gets worse, before it turns into something else. You've got sun damage that we've got to address before it becomes something worse."

You may not say that, "You've got precancerous lesions" because we're human beings. People panic. You don't have to say that. But you can say, "You've got a condition. You've got some lesions, and we want to take care of those things so that you don't find yourself in harm's way."

So whether a patient remembers or doesn't remember actinic keratosis eight years ago, I don't think it proves very much. But you're going to have something better, I think, than wondering whether people actually can remember that far back. Mr. Lee talked about medical assistants who are going to testify in this case, medical assistants who

wrote down on the charts and on the records Dr. Memar's diagnosis and the thing that he was observing because what would happen is the patient would come in and preliminarily meet with a medical assistant. They would get their medical history and write all that down and spend about 10 minutes with them.

And then Dr. Memar would come in. And he would look over the patient very closely. He's use something called a loupe which is like a magnifying glass for him to look at the patient's face in a way much more closely than these self-diagnosing, suddenly self-diagnosing patients could ever have done. So he looks very, very closely at them, and he touches the skin very closely. They call it palpate. I learned a new word for the trial. That's when you just touch it to see what the texture of it is like. And after, as he's doing this, he would be dictating to a medical assistant what he's observing.

And Mr. Lee talked about the training of medical assistants, and it's a real important point. Number one, in terms of their charting of this stuff, that kind of tells you what was said back then. Nobody remembers it, but you've got a piece of paper where a person is writing down, a medical assistant, what had been said. So when actinic keratoses are announced by Dr. Memar is not just him whispering that in his medical assistant's ear. There's a patient there about a foot

away, and they may not remember it today, but they'd be hearing the words. Okay.

So, one, it tells you in those records what actually was said. But there's another part that's important here, and that's that the medical assistants who worked for Dr. Memar were not unsophisticated. They were trained in all aspects of dermatology. And I think they're going to tell you they were trained in the matter of actinic keratosis. They were trained to know what it was. They were trained to recognize what it was and what it was not, and not just by Dr. Memar on the job as he'd go from patient to patient with them. Dr. Memar had a little bit of a library, and it had pamphlets and brochures and books that would talk about these conditions.

And I think it's not going to be a real debating point, these folks who worked for him were encouraged to get this stuff, take this stuff home, learn about actinic keratosis because you're going to be doing it probably every day in the practice, so better to know more rather than know less about a condition that you're going to be handling. You're going to be administering the treatment of this stuff after I diagnose it.

So what do you suppose would happen if Dr. Memar is with a patient and his trained medical assistant and he's barking out 15 actinic keratoses for the medical assistant to write down and she doesn't see anything. It's like a baby's

bottom. What would happen? You would think that at that point or afterwards, she would say, "What the heck is he talking about?"

Okay. And he encouraged these folks to be educated in this. They'd go to Dr. Memar and say, "Respectfully, Doctor, I didn't see it. What am I missing?" It never happened. It never happened here because the lesions were there. The diagnosis wasn't untrue because if it was, apart from asking that question, these are experienced people. They can work anywhere. They've done this a lot of years. What would you do? You'd be out of there like a shot. And that didn't happen. Who would stick around in a fraud shop when it's going on right under your face? It doesn't make sense. And in a criminal case, stuff has to make sense. It has to make sense beyond a reasonable doubt.

If this was the scheme by Dr. Memar, it's kind of a crazy one because for any patient at any time, you could have a medical assistant. A fair number of them came through there. You have to assume and protect and insure yourself that nobody, and I mean nobody, is going to blow the whistle on you. Otherwise, the house of cards comes down. Who would take that risk? It doesn't make sense. And as I said, it has to make sense beyond a reasonable doubt.

Dr. Memar in some of these cases would get a referral from another physician. And he would write back immediately

his diagnosis, 15 AKs or 15 actinic keratoses to be treated with IPL.

So think about that aspect of the scheme. You're telling the doctor who just looked at the patient closely enough in their face to refer them to you, and you're then sending them back a letter with a bunch of hooey in it. It doesn't commend itself to me, and I think unless it commends itself to you beyond a reasonable doubt, there's only going to be one answer at the end of this case. As I said, the scheme just doesn't make sense. And when all is said and done, I think you're going to come to that conclusion.

You heard a little something that I didn't want to forget about in terms of a consent form that patients sign that talked about this being a cosmetic procedure. You know what, that comes from the light manufacturer. Okay. And it's a matter, it's kind of a disclaimer because while you can, to be sure, use this for cosmetic treatments, there's always a chance that it's going to burn somebody.

So there's this disclosure and a patient's consent to be treated with something. That doesn't mean that it also cannot be useful for treating medical conditions. 80 percent of medicine is probably off-label. In other words, this machine might have been manufactured for skin rejuvenation, but that doesn't mean that it's the only thing that it's good for, and the same way drugs can somehow -- maybe they start

out being a headache medicine, but they might work for Alzheimer's. So the consent form, I think, is a little bit of a red herring.

But when you get to the end of this, it's just not going to make sense in the way that the Constitution requires for you to come to a verdict. When we're done with this, we're going to ask for a verdict in favor of Dr. Memar.

My name is Andy Staes. I'm here with Steve Scallan and Jeff Smith. We're here for Dr. Memar. And we appreciate the time that you have taken out of your life to hear Dr. Memar's case.

THE COURT: Mr. Lee, you may call your first witness, or Mr. Raman.

MR. RAMAN: Thank you, Judge. The government calls Jill Jaroch.

THE COURT: Right around here. Please raise your right hand.

(Witness sworn.)

THE WITNESS: Yes.

THE COURT: Please be seated.

Mr. Raman, you may question the witness.

JILL JAROCH, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. RAMAN:

Q. Good afternoon. How are you?

A.   I'm good.  Thanks.

Q.   Can you please state your full name and spell your last name?

A.   Yes.  It's Jill Jaroch.  The last name is J-a-r-o-c-h.

Q.   And can you please keep your voice up as well?

A.   Sure.

Q.   What community do you live in?

A.   Park Ridge.

Q.   And are you married?

A.   I am, yes.

Q.   What's your educational background briefly?

A.   I have a bachelor's of science from the University of Michigan and an MBA from the University of Chicago.

Q.   And after you graduated from college, what was your first job?

A.   I started as a pharmaceutical sales rep for Parke-Davis, and shortly thereafter, they were purchased by Pfizer, and I spent 15 years at Pfizer.

Q.   Can you tell us what type of work you did as a pharmaceutical representative?

A.   Yes.  So we basically would call on physicians and provide education and information about the products that we sold and oftentimes provide samples for patient use to start out on medications.

Q.   And are you doing that now?

A.   No.   I'm -- for the last about seven years, I've been working in marketing and strategy and operations but still in the pharmaceutical industry.

Q.   And how does that differ from what you did before?

A.   So I no longer call on doctors or healthcare providers.  I work in-house at headquarters and develop kind of our marketing pieces, the pieces that our rep would go out and show to the doctor, work on sometimes direct-to-consumer advertising and strategy, business development plans, stuff like that.

Q.   Approximately how old are you now?

A.   I'm 40.

Q.   Now, I'm going to direct your attention to approximately July of 2007.  Did you meet a doctor by the name of Omeed Memar?

A.   Yes.

Q.   How do you know him?

A.   I went to him about that time because I heard he offered inexpensive Botox, and so I went to him to get Botox and then saw him for some other skin issues, predominantly because I had melasma which is like kind of dark spots on my face.

Q.   We'll talk about that in a little more detail, but do you see Dr. Memar here in the courtroom today?

A.   He's over -- I don't know if I would recognize him, to be honest with you.

Q.   Okay.  I'm going to direct your attention to 2007, approximately July.  Did you begin going to the defendant's practice at that time?

A.   Yes.

Q.   About how long was he your doctor?

A.   I'm not exactly positive, but it was a while, like maybe eight, nine, ten years, I would say.

Q.   And you mentioned how you began to see him.  Why did you begin to see him?

A.   So like I said, I went over there to get Botox initially, and then he evaluated me for melasma.

Q.   When you saw the defendant, did you have insurance?

A.   Yes.

Q.   Which insurance?

A.   Blue Cross Blue Shield.

Q.   And how did you pay for your doctor's visits and any treatments that he offered you after during the time that you saw him?

A.   So Botox, I always paid cash or like with a credit card.  And then any doctor's visits, I paid a co-pay.

Q.   Now, you mentioned that when you first began seeing the defendant, you had a condition called melasma.  Can you tell us what your understanding of that condition is and describe it for us?

A.   Yes.  So it's just, it's just dark kind of spots, almost

looks like kind of a rash on your face that I think when I researched it, a lot of women get it when they've been pregnant, that they get kind of the darkening of their skin.

Q.   And did you have a chance to touch your skin before you saw the defendant?

A.   Yes.

Q.   And would you describe that texture?  How would you describe the texture of your skin before you saw the defendant?

A.   It just feels like regular skin.

Q.   Smooth?

A.   Yeah.  It's just the appearance that looks dark.  It doesn't feel any different.

Q.   Were there any rough or scaly patches?

A.   No.

Q.   Now, when you first saw the defendant -- let me back up for a minute.

Would you be familiar with how you looked back in 2007, 2008?

A.   Yes, I think I would recognize myself.

MR. RAMAN:  Okay.  Can we have Government's Exhibit 35?

BY MR. RAMAN:

Q.   Ms. Jaroch, I'm going to hand you what's been marked as Government Exhibit 35.  I ask you to please have a look at

that. Do you recognize Government Exhibit 35?

A. Yes. That's me.

Q. And is it a fair and accurate representation of how your face looked when you began seeing Omeed Memar back in 2007 and 2008?

A. Yes. This is a picture I sent you from, I think, January of that year.

MR. RAMAN: And may we publish, your Honor?

THE COURT: You may.

Any objection?

MR. STAES: No objection.

THE COURT: You may publish.

BY MR. RAMAN:

Q. So just to clarify for the record, you're looking at Government Exhibit 35. Can you tell us approximately when that photograph was taken?

A. I think it was January 23rd of 2007, I believe.

Q. And when you saw the defendant, did he examine your face?

A. I don't -- I don't remember the first time I saw him, but I would imagine if he did Botox on me, he did examine my face.

Q. And did the defendant tell you that you had any precancerous conditions on your face at any time when he examined you?

A. Absolutely not.

Q. Did the defendant tell you if you had actinic keratosis,

or AK, when he examined you?

A. Not that I recall, no.

Q. Would you have remembered if the defendant had told you that you had a precancerous condition on your face?

A. Yes.

Q. Would you have remembered if he had told you you had actinic keratosis?

A. I don't know about that.

Q. With respect to the precancerous condition on your face, why would you remember that?

A. Because I think that's pretty serious, and I was only, I think, 30 years old at the time, so if somebody had told me I had cancer, I think I would have remembered it.

Q. And you mentioned before that you began seeing the defendant for melasma, right?

A. Well, for Botox and then subsequently for melasma.

Q. And so what treatments did he recommend besides Botox?

A. What I remember is that he gave me -- I don't know exactly what it was, but it was like a tub and it had like pads in it, almost like those Stridex pads that you would put some medication on my face. To the best of my recollection, that's what I remember as far as treatment for that.

Q. Did you get any cosmetic treatments besides Botox from the defendant?

A. So besides the -- sorry, the pads for the treatment, I

also got laser treatments done --

Q. Okay.

A. -- for the melasma.

Q. And was that something the defendant recommended for your melasma?

A. Yes.

Q. Did any of the defendant's employees tell you that you had a precancerous condition?

A. No.

Q. Who would apply the laser treatments to your face?

A. There was a woman who did it, and I don't remember her name, but I don't know if she was like their laser person.

Q. Was the defendant present when the laser was applied to your face?

A. No.

Q. Did the employee who did the laser treatments for you tell you that you had a condition called actinic keratosis, or AK?

A. I don't recall that.

Q. To the best of your recollection, do you ever remember if the defendant removed any scaly plaques or scaly patches from your face at any time during any of the IPL treatments?

A. Never, no. I never remember having a scaly patch.

Q. It's fair to say, he wasn't there at that time when you were getting the IPL treatments?

A. Yeah. No, he was never there during the lasers.

Q.   Did any of the defendant's employees ever tell you that they were removing scaly plaques or scaly patches or lesions of any kind from your face?

A.   No.

        MR. RAMAN:  May I have a moment, your Honor?

     (Pause.)

BY MR. RAMAN:

Q.   Ms. Jaroch, what was your understanding of why you were having the IPL treatments?

A.   To help with the melasma.

Q.   And for those here who may not know, can you briefly describe what was involved with the IPL treatments, the laser treatments?

A.   Yes.  They put like a gel on your face, like an ultrasound gel.  And then there was like a wand of some sort that they would zap you with.  And it hurts really bad.  It's like a rubber band snapping at your face really hard all over your face.

Q.   And about how long did the treatments take typically?

A.   I don't know.  Like 15, 20 minutes.

Q.   And is this what you were referring to before when I was asking you about laser treatments and IPL treatments?

A.   Yes, yeah.

Q.   They meant the same thing to you?

A.   Uh-huh, yeah.

Jaroch - cross by Staes

41

MR. RAMAN:  Nothing further, Judge.

THE COURT:  Cross-examine?

MR. STAES:  Thank you, Judge.

THE COURT:  Mr. Staes.

CROSS-EXAMINATION

BY MR. STAES:

Q.  Good afternoon, Ms. Jaroch.

A.  Hello.

Q.  If I remember the start of your testimony, you thought maybe you had seen Dr. Memar for eight, nine, or ten years, right?

A.  Yeah.  I don't -- I'm afraid I don't really remember exactly how long it was.

Q.  It was a long time ago, right?

A.  Yes.

Q.  And I think you said that you didn't exactly or you didn't remember even the first time that you saw him, right, that long ago, that many years ago?

A.  Like, I don't remember the specifics of the visit?

Q.  Right, whether or not he examined you.  You think he must have but you don't remember it?

A.  Well, I know I went for Botox, yeah, so I -- I know he was the one that always applied the Botox, so I figure he was looking at my face --

Q.  Okay.

Jaroch - cross by Staes

42

A.  -- when he did that.

Q.  Is that about all you remember?  Anything else that strikes you about that first meeting, if you remember?

A.  No.

Q.  It's fair to say, is it not, that since we're going back eight or nine or ten years, we're not even sure which, you wouldn't say that you remember everything that was or was not told to you by Dr. Memar or his staff, would you?

A.  That's true, yeah.

Q.  And I think you even said that whether or not Dr. Memar or his staff told you that you had AKs, or actinic keratosis, you couldn't remember one way or the other; isn't that right?

A.  Yeah.  I wouldn't remember those words, I don't think.

Q.  But Dr. Memar did say that you had some spots that should be taken care of and that he was going to do that; isn't that right?

A.  Yeah, the melasma.

Q.  Ma'am, you weren't sure whether or not melasma was something that Dr. Memar diagnosed or given your prolific research, you had diagnosed yourself; isn't that right?

A.  No.  He -- I researched it after he told me that, was my recollection.

Q.  Do you remember telling the government that you weren't sure whether or not the initial diagnosis of melasma was Dr. Memar's or yours?

A.   No.

Q.   Possible?

A.   I guess that's possible, but I don't think I self-diagnosed myself but...

Q.   But you did a lot of research, right?

A.   After, yes.

Q.   Okay.  And you did a lot of research on whatever was going on with your skin, am I right about that?

A.   Yes.

Q.   Okay.  Now, back in those days, you were taking, as I understand it, Zoloft?

A.   Yes.

Q.   And did your research ever tell you that one of the side effects of Zoloft is some memory impairment?

A.   No.  I sold Zoloft for almost ten years, and I don't remember that being a big side effect of Zoloft.

Q.   Do you say that it's not?

A.   Yeah.  I don't -- that wasn't a common side effect of Zoloft.

Q.   I'd like to be clear in terms of the picture that we've seen.  That was January 23rd of 2007, I think you said?

A.   I think that's when I pulled it, yeah.

Q.   How do you remember --

A.   I could check to be sure.

Q.   -- that day ten years ago, ten and a half years ago; a

Jaroch - cross by Staes

44

special occasion?

A.   How do I remember?

Q.   Yes.

A.   No, because on my computer, it has all the dates.

Q.   Yes.

A.   No, I wouldn't --

Q.   In fact, Dr. Memar didn't diagnose you with actinic keratosis in January of 2007, did he?

A.   I -- I don't ever remember being diagnosed with actinic -- whatever it is.

Q.   If I told you that the first record of an actinic keratosis treatment whether it occurred or not isn't until 2008, does that sound familiar to you?

A.   I don't ever remember being diagnosed with that, so I don't...

Q.   But as you said, you don't remember not hearing those words either?

A.   Fair, yes.

Q.   Now, in your research, did you look into what actinic keratosis was?

A.   No.  I never knew what it was until the agent came to my house.

Q.   So you don't know -- I'm sorry.  You don't know its characteristics, right?

A.   I do now.

Jaroch - cross by Staes

45

Q.   But you didn't back then?

A.   Right.

Q.   And you didn't know what it felt like, what it looked like?

A.   No.

Q.   You were also treated by Dr. Memar for rosacea, were you not?

A.   I think so, yeah.

Q.   And did you do a fair amount of research into rosacea?

A.   Probably.

Q.   Okay.  Do you not know one way or the other?

A.   I don't remember doing the research, but that's something I would do.

Q.   Okay.  And you know that rosacea, one of the characteristics is redness, right?

A.   Yes.

Q.   Okay.  And another characteristic of rosacea is that the skin can be scaly; isn't that right?

A.   I never had that experience, but --

Q.   But you know that's one of the characteristics?

A.   I don't know that.

Q.   One way or the other?

A.   I don't know.

Q.   And you know that another characteristic of rosacea, I assume, is that it's dry skin, right?

A.   I don't know.  I -- mine never manifested like that.

Q. Did you use moisturizer back then?

A. Yeah, I've always used moisturizer.

Q. Did your research ever tell you that rosacea is commonly mistaken for actinic keratosis, either then or afterwards?

A. No.

Q. You also had something called -- and I apologize if I don't say it right -- perioral dermatitis in your facial area, did you not?

A. I don't know. Was it periorbital maybe? I think that could have been like the -- I had like little breakouts like around my mouth, perioral, maybe.

Q. I make no warranty for my pronunciation, so I'm going for yours.

A. Yes.

Q. I'm referring to Dr. Robinson's records that talk about this condition.

A. Yeah.

Q. Did you do any research on that?

A. Probably. It was just like little pimples, breakouts around my chin.

Q. Did your research reveal to you that perioral dermatitis involves red and scaly bumps? Does that sound familiar?

A. That wasn't my -- how it manifested for me, but it's possible it does for some people. I just had little breakouts.

Q.   It didn't manifest it that way for you from your examination of yourself, right?

A.   Right.

Q.   You don't claim to have a dermatological background, notwithstanding your work for Pfizer or anybody else, right?

A.   No, but I know what scaly is versus non.

Q.   Now, Dr. Memar initially talked with you about melasma in your face.  Have I got that right?

A.   I did talk to him about that, yeah.

Q.   That was an initial diagnosis, whether he reached it or you, that you guys talked about?

A.   Well, like on the first time I went to him was for Botox, not melasma.

Q.   The first time that at least, according to the records, you were treated for actinic keratosis was a ways down the line after that.  I assume you've gone through some of your records?

A.   I have not.  They told me not to go through my records, so I haven't.

Q.   If Dr. Memar was going to diagnose you with actinic keratosis, you wouldn't have known one way or the other whether that was right, isn't that true, since you didn't know what it was?

A.   I'm sorry.  Could you --

Q.   If Dr. Memar had diagnosed you, say, early on, the very

Jaroch - cross by Staes

48

start with actinic keratosis, you wouldn't have known whether that was true, untrue, or otherwise? You didn't know what it was, right?

A. No. I mean, my -- how I would do things, though, if I had been diagnosed with something, I would have done some research on it.

Q. My question is: Would you have known when he said it whether it was right or wrong?

A. No, absolutely not.

Q. Or when he put it in your chart, would you have known that it was right or wrong or right on the money in terms of your dermatological condition, or you wouldn't know?

A. I wouldn't know.

Q. So he could have put it in your very first diagnosis and been charging back then and you would have taken the IPLs for it, right, if he said that's what you needed?

A. Yes, but I was doing the IPL for my melasma, is what I was told.

Q. In any event, early on, Dr. Memar did not diagnose you with actinic keratosis and start charging you for IPL for it, to your knowledge, did he?

A. I don't ever remember being diagnosed with that.

Q. Do you find -- have you found in your experience that it's not all that uncommon for doctors including dermatologists to change their diagnosis as they spend more time with a patient,

from time to time?

MR. RAMAN: Objection.

BY THE WITNESS:

A. I don't know.

BY MR. STAES:

Q. Well, you saw Dr. Robinson after you saw Dr. Memar, did you not?

A. Yeah. I still see her.

Q. Okay. And initially, there was a diagnosis of rosacea, right?

A. I mean, I have rosacea, so yes.

Q. Then there was a diagnosis after that. Do you remember her diagnosing rhytidosis facialis? Do you remember that one?

A. No.

Q. Okay. Do you deny that that happened?

A. No.

Q. Okay. Then there was something called nevus. Do you remember that?

A. Called what?

Q. Nevus, n-e-v-u-s. And again, I make no guarantees about the --

A. No.

Q. Okay. You were interviewed by the government in August of 2012. Do you remember that?

A. Yes.

Jaroch - cross by Staes

50

Q.   And at that time, Dr. Memar, you told them, was still your doctor; is that right?

A.   If I told them that, then he probably was.

Q.   And you had not had an IPL treatment for actinic keratosis or whatever in the preceding nine months.  Does that sound familiar?

A.   I wouldn't remember exactly when I had the treatments but...

Q.   So Dr. Memar could have continued to be giving you this IPL for AK or whatever for nine months charging you but he didn't do it, do you remember that?

A.   I guess I don't understand the question.  I'm sorry.

Q.   That's okay.  I'll withdraw it.  You went to Dr. Memar, I think you testified, because he had cheap Botox; isn't that right?

A.   Yes.

Q.   Among other things?

A.   Inexpensive, yes.

Q.   And even though, I think you have said at some point but he'll tell us, he was paying the same for Botox as other doctors, right?

A.   I would presume.

Q.   Okay.  And he was charging you about 50 percent of the going rate; isn't that right?

A.   I don't remember.  I don't know.

Jaroch - cross by Staes

51

Q.   So do you remember paying about $300 for Botox treatments?

A.   That's -- that sounds about right.

Q.   And does $600 sound about normal?

A.   That seems high.

Q.   Okay.  Does it -- does it make sense to you for a doctor to make up a condition so he can charge a few extra dollars and then to be --

        MR. RAMAN:  Objection.

        MR. STAES:  -- giving you half off on Botox when he can charge you twice as much?

        MR. RAMAN:  Objection.

        THE COURT:  Objection sustained.  I think that's speculation.

BY MR. STAES:

Q.   Okay.  You told the government, did you not, that because he was giving you this big discount on Botox that you had some concerns that he might be -- I don't know.  You had some concerns about that?

A.   No.  My concern was when an FBI agent showed up at my house out of nowhere, of course I was concerned because that doesn't happen every day, and so my first thought when they said it was about Dr. Memar was, "What did he give me, you know, for my face?  Was there something wrong with what he injected or the pads that I was putting on my face?"

        That was kind of my first -- not knowing what

everything was about.

Q.  So you didn't tell the FBI that the fact that he was giving you this big discount caused you to be a little suspicious, so that I'm clear?

A.  I don't -- I don't remember thinking that.  I was just thinking that the FBI was at my house which was concerning to me and that it -- that was just where my mind went right away for whatever reason.

MR. STAES:  Judge, if I could have a moment.

(Pause.)

BY MR. STAES:

Q.  You say that, I think, earlier, a few minutes ago, Dr. Memar gave you the IPLs for the dark spots that were on your face.  Do you remember we talked about that?

Ms. Jaroch?

A.  Oh, yes.  Sorry.  Yes.

Q.  And, in fact, the IPLs applied to the dark spots on your face, it worked, didn't it?  Didn't the spots start to fall off?

A.  So I guess it's kind of a mischaracterization to say "spots."  It's more like a -- I don't want to -- it's not just like spots on your face.  It's almost like a -- I don't want to say a rash, but like kind of like kind of follows that design.  Like it almost looks like your face is just dirty.

And what would happen after I got the IPLs is that

there would be some parts of my face, it would get -- it would almost like -- it gets darker and then it sloughs off over the next couple days which is how -- what they explained to me would happen.  It never got rid of the melasma.  I'm still being treated today for melasma, but I understand that's common, so...

Q.  So that I'm clear, did you tell the FBI that a few days after the treatment, the dark spots fell off your face?  Were those your words to the FBI?

A.  Yeah, but these weren't spots that were there before. This is what happens after the laser.  It makes -- the laser, like, kind of -- I don't know if "burns" is the right word, but it makes these spots on your face that then fall off. They weren't there before.

Q.  So the laser created the spots, that's what you're saying now?

A.  Yes, yes.

MR. STAES:  One second, Judge.

(Pause.)

BY MR. STAES:

Q.  Ms. Jaroch, that's all I have.  And by the way, that's Dr. Memar just in case -- it sounded like you didn't remember.

A.  It's been a few years.

THE COURT:  You can call your next witness.

You can step down.

(Witness excused.)

THE COURT:  Call your next witness.

MR. RAMAN:  The government calls Neha Robinson.

THE COURT:  All right.  Right up here.  Please raise your right hand.

(Witness sworn.)

THE WITNESS:  Yes.

THE COURT:  Please be seated.  Keep your voice up, please.

You may question the witness.

MR. RAMAN:  Thank you, your Honor.

NEHA DAVE ROBINSON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. RAMAN:

Q.  Good afternoon.  Can you please state your full name and spell your last name for the court reporter?

A.  Neha Dave Robinson, R-o-b-i-n-s-o-n.

Q.  What do you do for a living?

A.  I'm a dermatologist.

Q.  And how long have you been a dermatologist?

A.  Since 2003.

Q.  What educational background did you need to complete to become a dermatologist?

A.  Completing my undergraduate degree, my medical degree, an internship in internal medicine, and then a residency in

Robinson - direct by Raman

55

dermatology.

Q.   And how are you employed right now, Dr. Robinson?

A.   I am a practicing physician and partner in a private practice in Chicago.

Q.   And how long have you had the private practice?

A.   Since 2007.

Q.   What's the name of the private practice?

A.   Dermatology & Aesthetics.

Q.   And are there other doctors who work in your practice?

A.   Yes.

Q.   For dermatology patients that you see in your practice, are the conditions that you treat primarily cosmetic?

A.   General dermatology and cosmetic dermatology.

Q.   What do you mean by "cosmetic dermatology"?

A.   That entails Botox, fillers, anti-aging, laser treatments, chemical peels.

Q.   I'm going to hand you -- I'm going to hand you what has been marked as Government Exhibit 33 and ask you to look at that.  I'm also handing you what has been marked as Government Exhibit 83.  I'd ask you to take a look at that as well.

A.   Okay.

Q.   Doctor, do you recognize Government Exhibit 33 and Government Exhibit 83?

A.   Yes.

Q.   How do you recognize these exhibits?

A.   They are office notes from my office.

Q.   And were these records made by a person with knowledge of the acts and the facts that are -- and events that are depicted therein?

A.   Yes.

Q.   Were the records made at or near the time of the acts and events that appear in the records?

A.   Yes.

Q.   And is it the regular practice of Dermatology & Aesthetics of Wicker Park, your office, to make such records?

A.   Yes.

Q.   And were the records contained in Government Exhibits 33 and 83 kept in the ordinary course of a regularly conducted business activity?

A.   Yes.

Q.   In fact, Doctor, do these records contain your electronic signatures in certain places?

A.   Yes.

         MR. RAMAN:   Move to admit Government Exhibits 33 and 83.

         THE COURT:   Objection?

         Hearing no objection, they're admitted.   You may publish.

         MR. RAMAN:   Thank you, your Honor.

      (Government Exhibits 33 and 83 received in evidence.)

BY MR. RAMAN:

Q. In your medical -- first of all, Doctor, who do the records refer to? What patients does Government Exhibit 33 concern, and what patient does Government Exhibit 83 concern?

A. 83 is referring to Anna Gordon, and 33 is Jill Jaroch.

Q. Doctor, do you see both patients currently in your practice?

A. Don't know if I can say when the last time I saw them in terms of defining "currently."

Q. Okay. As far as recently, have you seen both patients? Are the names familiar to you?

A. They're familiar. I don't know if I've seen Jill Jaroch recently.

Q. And, Doctor, in your medical practice, do you perform what is called a total body skin exam?

A. Yes.

Q. Tell us what's involved in performing a total body skin exam.

A. It's evaluation of the skin from head to toe looking for lesions suspicious for cancer or precancerous areas.

Q. When you say "head to toe," does the patient have -- are they covered when you do this?

A. They are undressed. They have a gown on. They are offered to remove their underwear, or they may keep it on for privacy.

Q. And as part of that total body skin exam, do you typically closely examine the head, the face, the neck of the patient?

A. Yes.

Q. And with respect to a patient chart, when it says "total body skin exam," what is it referring to? What is the chart documenting?

A. The note would be documenting the areas that we examined and our findings during that visit.

Q. And just to be clear, that's when you perform the total body skin exam, you would document that on a patient note if you indeed perform that --

A. Yes.

Q. -- on that patient?

And if you see something abnormal during the total body skin exam, Doctor, do you document that on the chart?

A. Yes.

Q. How would you do that?

A. Written documentation describing the findings and our -- my plan in terms of how we would approach or treat that area if it required treatment.

Q. Doctor, in your practice, do you also perform exams sometimes just on the head, face, and necks of the patients as opposed to doing the total body skin exam?

A. Yes.

Q. What's involved when you focus on the head, face, and neck

and perform an exam just on those parts of the body?

A. It's evaluation of those areas specific to the problem that the patient is there for.

Q. And as part of that, does it involve closely examining the head, face, and neck?

A. It does, depending on the reason that they are there and depending what areas of the face are involved.

Q. When a chart says that you examined the head, face, and neck, is that referring to what you just described, your examination of the head, face, and neck?

A. Yes.

Q. Typically, Doctor, in your practice, if you see something abnormal during the head, face, and neck exam, do you document that?

A. Yes.

Q. How would you document that?

A. I would write it into the chart.

MR. RAMAN: May I have a moment, Judge?

(Pause.)

BY MR. RAMAN:

Q. Doctor, just a few more questions briefly. Are you familiar with actinic keratosis, or AK?

A. Yes.

Q. And if you had diagnosed AK, would you have documented that for these patients?

A.   Yes.

MR. RAMAN:  Nothing further, Judge.

THE COURT:  Cross-examine?

MR. STAES:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. STAES:

Q.   Good afternoon, Dr. Robinson.  You saw patients Jaroch and Anna Gordon beginning in around what time, Doctor?

A.   Based on these records, the first visit here with Jill Jaroch is November 2008 if these are in the correct order, and based on what I'm looking at here for Anna Gordon was April 2009 -- actually, sorry.  That was a visit by my partner.

Q.   And your partner's name is what, Doctor?

A.   Dr. Keren Horn.

So the first visit with me with Anna Gordon was December 2010.

Q.   Dr. Robinson, am I right that you have no independent recollection of your examinations and meetings with those two ladies apart from your notes?

A.   Correct, yes.

Q.   And that's why you look at your notes, so that you can see what may or may not have occurred; and otherwise, you wouldn't remember what had happened as to a given patient back then, would you?

A.   No.

Q.   And in your experience, patients don't normally remember any better than you, do they?

A.   I don't know if I could say if they do or not, but...

Q.   You've had a fair amount of patients, I take it, who have forgotten perhaps what you've told them in earlier examinations; isn't that right?

A.   That -- yes.

Q.   Now, you say that, and I think in response to the questioning, if there was an abnormal skin condition when you're conducting your examination, if it was there, you would note it?

A.   Yes.

Q.   For example, if a patient had rosacea, that would be in your chart?

A.   Yes.

Q.   If they had melasma, that would be in your chart if you observed it, right?

A.   Yes.

Q.   In fact, as to Ms. Jaroch, one of the things that you noted on about July 25th of 2011 -- and you can look at your notes -- is that she complained of melasma, right?

A.   Let's take a look.

     Yes.

Q.   And you then note in your assessment the melasma, right?

A.   Yes.

Q.   You also noted that Ms. Jaroch had complained that the melasma on her forehead and perioral area had gotten worse. And it's at the top, if you can look there.  Do you see where I'm referring to?

A.   Yes.

Q.   And obviously, Ms. Jaroch had had melasma for a while, right?

A.   I don't know.  I don't see that it's documented how long she has had it.

Q.   Well, she said it had gotten worse, so it had existed at least before she got to you that day, correct?

A.   Sure.

Q.   Okay.  And melasma is a chronic condition, is it not?

A.   It can be, depending, for some people.

Q.   Now, you had seen Ms. Jaroch five times before that meeting, had you not?  And I can give you the dates if you need them.

A.   Sure.  I can count to make sure it's accurate.

Q.   Sure.

A.   Yes.

Q.   And in none of those initial meetings with -- or examinations of Ms. Jaroch do you note melasma, am I right?

A.   I do not.

Q.   So the fact that you don't note the existence of a condition on a given day doesn't mean necessarily that it's

not there; isn't that right?

A.   That's correct.

Q.   It's also possible when you examine a patient, I think as I heard you, that sometimes you're looking for a specific thing, right?

A.   Yes.

Q.   And that might cause you not to note other things that might be present; isn't that right?

A.   Yes.

Q.   Now, the other patient, I think you testified, you saw was Ms. Gordon; isn't that true?

A.   Yes.

Q.   And your partner actually saw Ms. Gordon before you did, Dr. Horn?

A.   Yes.

Q.   And your partner assessed Ms. Gordon as having acne, did she not?

A.   Yes.

Q.   And she had consistently diagnosed your patient, Ms. Gordon now came to you, as having acne; isn't that right?

A.   So yes, it's noted in two, the first two visits.

Q.   You don't start seeing Ms. Gordon until December 28th of 2010; isn't that right?

A.   Yes.

Q.   And you assess her or you note that she had milia and

sebaceous hyperplasia, do you not?

A.   Yes.

Q.   There's no note there of acne, am I right?

A.   Yes.

Q.   So again, the fact that your records or your notes don't note a particular condition doesn't mean it doesn't exist when you see that patient; isn't that right?

A.   That's correct.  She may not have brought it up.

Q.   Ms. Gordon had all -- had also complained to you of a bump on her chin, did she not?  And you can take a look at your notes.

A.   Which visit are you looking at?

Q.   I think on perhaps September 15th of 2011.

A.   Yes.

Q.   And it was significant enough for you to note that day, correct, on September 2011?

A.   It was in the history.  It was significant for her to have mentioned, yes.

Q.   She told you, did she not, that she had had that bump on her chin for four months before that time, didn't she?

A.   Yes.

Q.   And your records in the four preceding months don't mention anything about a bump on her chin, am I right?

A.   Correct.

Q.   Now, I think we talked a little bit about actinic

Robinson - cross by Staes

65

keratosis.  Dermatological conditions can change over time, can they not?

A.   Yes.

Q.   They can change on their own, right?

A.   Yes.

Q.   And they can change with treatment; isn't that true?

A.   Yes.

Q.   And they can resolve in terms of actinic keratosis, and then they can come back on their own spontaneously; isn't that right?

A.   Yes.

Q.   And if Dr. Memar had been seeing a patient, one of these patients before you and had treated that patient for actinic keratosis, you wouldn't expect to see actinic keratosis when you saw the patient; isn't that right?

A.   Yes.

Q.   Now, actinic keratosis can be a little tricky to diagnose sometimes, can't it?

A.   Yes.

Q.   And dermatologists, even dermatologists themselves can disagree or come to different conclusions; isn't that right?

A.   Yes.

Q.   Actinic keratosis can mimic other things, for example, rosacea?

A.   I wouldn't say that actinic keratoses would mimic rosacea.

Q.   It can certainly coexist with rosacea?

A.   Yes.

Q.   We saw a lovely picture of Ms. Jaroch a few minutes ago. I assume that you wouldn't just diagnose a patient with or without AK based solely on a picture, would you?

A.   No.

Q.   Now, actinic keratosis is a precursor to either basal cell carcinoma or squamous cell carcinoma; isn't that right?

A.   Yes.

Q.   And if you have a choice in terms of diagnosing something as AK which possibly might be, it's more serious, as opposed to something less serious, would you normally err in favor of the more serious?

A.   Yes.

Q.   Now, we talked a little bit about if Dr. Memar had treated someone for AK before they got to you and you wouldn't expect then to see them, that's why you would never say or you would not say as you looked at a patient that they had never had actinic keratosis; am I correct about that?

A.   Yes.

Q.   And you would especially, I take it, never say that about someone like Anna Gordon?  Do you remember her, her conditions?

A.   Yes.

Q.   Okay.  She had a history of blistering sunburns, do you remember that?

Robinson - cross by Staes

67

A.   Yes.

Q.   And that would make her pretty much a classic candidate for actinic keratosis, wouldn't it?

A.   It could.

Q.   Give her a good shot at it, wouldn't it?

A.   It could increase her chance.

Q.   Well, actinic keratosis is sun damage at its essence, is it not?

A.   Yes.

Q.   And a blistering history of sunburns is sun damage, isn't it?

A.   Yes.

Q.   Now, Ms. Gordon also had a condition called xerosis of the face.  And I'm looking at your December 17, 2012, record, Dr. Robinson.

A.   Okay.

Q.   Xerosis of the face is dry, scaly, right?

A.   Yep, yes.

Q.   And she also had redness of the face, did she not?

A.   Not that I see documented.

Q.   She also had lesions --

A.   On --

Q.   I'm sorry, Doctor.

A.   On December 17, 2012, is that what you're referring to?

Q.   I was actually looking at a statement of Ms. Gordon

earlier, but what are you looking at?

A.   I was still looking at that December 17th note.

Q.   Okay.  But does that persuade you that she had some redness going on?

A.   No.

Q.   Okay.  She had lesions that were associated at least with some pink bumps, did she not?  And you can look at your notes, but I'm looking at December 2nd of 2010.

A.   So let me go back to 2010.

Yes, on December 2nd, 2010, yes.

Q.   Okay.  So you noted she had lesions?

A.   Yes.

Q.   Okay.  If we could turn to Ms. Jaroch, please, the records will show, and I don't ask you to accept this, that she had been diagnosed with actinic keratosis by Dr. Memar in February of 2008 and getting IPL treatments.  You didn't see her -- I'm sorry.  She had been getting IPL treatments since July 26th of 2007.

You didn't see Ms. Jaroch until November of 2008, right?

A.   Yes.

Q.   So given all that treatment, you would not have expected to see AKs on her face, am I right?

A.   It could have resolved.

Q.   Now, Ms. Jaroch, she did have redness, didn't she, on her

face?

A.   Yes.

Q.   And she had redness on her face for years; isn't that right?

A.   Yes.

Q.   And she also had something called erythema on her face; isn't that right?

A.   That is redness.

Q.   And that means redness.  Okay.  That would be my question.  Thank you.  She also had something that you noted as "perioral dermatitis in facial area;" isn't that right?

A.   Which note are you looking at?

Q.   I'm looking at November 7th of 2012 and December 19th of 2012.

A.   So December 19th, 2012 --

Q.   Right.

A.   -- is a facial note.  We sign it because we're supervising physicians, but that's the facial documented by our aesthetician, so it's not a medical visit.

Q.   Okay.  Is there something noted in terms of perioral dermatitis?

A.   Yes.  Based on the initials there, that's our aesthetician that felt that she had that and she should -- was recommended something, but that wasn't a visit with me.

Q.   Okay.  And perioral dermatitis is a facial rash that is

most often red and scaly; isn't that right?

A.   Yes.

Q.   You have seen hundreds of actinic keratoses patients in your career, have you not?

A.   Yes.

Q.   And you've had patients with AK in their 20s and their 30s; isn't that right?

A.   Probably in their 30s.

Q.   And it's become -- I'm sorry, Doctor.  I interrupted you.

A.   Probably in their 30s.

Q.   And it's become more and more prevalent with young people than in the past; isn't that right?

A.   Yes.

Q.   You would agree, would you not, that there is no single treatment for actinic keratosis?

A.   Yes.

Q.   And a lot of it depends on patients' particular circumstances and their tolerances; isn't that right?

A.   Yes.

Q.   And there's something that's known as a field approach to actinic keratosis; isn't that right?

A.   Yes.

Q.   And that's a more proactive approach to AK, isn't it?

A.   Yes.

Q.   And for example, if you were to apply light therapy,

photodynamic therapy or IPL, that's a field treatment, right?

A.   Photodynamic therapy is, yes.

Q.   Now, photodynamic therapy involves first the application of Levulan to a patient's face?

A.   Yes.

Q.   And then you apply the light; isn't that right?

A.   Yes.

Q.   And the Levulan can have some pretty nasty side effects; isn't that true?

A.   Yes.

Q.   You know, I take it, of no standard of care that precludes the treatment of actinic keratosis with IPL alone, do you?

A.   No.

Q.   And you know that this case involves Dr. Memar's treatment of actinic keratosis or his claim to be treating actinic keratosis with IPL alone, right?

A.   I didn't --

Q.   You've learned that?

A.   -- until now.

Q.   Okay.  You have not discussed with the government that Dr. Memar's treatment of these patients that you had was with IPL alone?

A.   We didn't get into the details of the case.

Q.   Well, how about that detail?  Does that sound familiar?

A.   No.  I think I might have assumed it maybe, but I didn't

know --

Q.   And you also assumed that if Dr. Memar had been treating these patients for AK before you that, as you've said, you wouldn't have seen it, right?

A.   That's possible.

Q.   You didn't tell the government, "Look, I would have seen it because if he's just using IPL alone, there's just no way it's going to work," right?  You didn't tell them that, did you?

A.   I did not.

         MR. STAES:  That's all I have, Judge.

         THE COURT:  Anything further?

         MR. RAMAN:  Very briefly, Judge.

                    REDIRECT EXAMINATION

BY MR. RAMAN:

Q.   Doctor, just to get back to a couple questions that counsel asked you, in the patient charts for Jill Jaroch or the patient charts for Anna Gordon, there's a substantial section on your standard notes which says, "Family history," right?

A.   Yes.

Q.   And there's also a substantial section for past medical history, right?

A.   Yes.

Q.   And correct me if I'm wrong, are these based on -- the

answers that you document on these notes, are they based on your asking the patients if they have certain family histories or certain past medical histories including, for example, actinic keratosis?

A.   Yes, based on an initial form that they might fill out as opposed to a verbal question.

Q.   So if a patient filled out that they had actinic keratosis, they knew that and they came to you even if they didn't mention it, you would ask them about it?

A.   If they didn't mention it, we would ask them if maybe we were doing a total body scan exam and it was relevant.  If they didn't write it down and it was not relevant, it may not necessarily be there.

Q.   So if the patient didn't know they had actinic keratosis, you wouldn't know?

A.   If they didn't know, we wouldn't know.

Q.   But it's something important for you to know, so if they had told you they had actinic keratosis, you would probably write that down?

A.   If they told me they had it, I would write it down, yes.

Q.   Doctor, you mentioned, you were asked some questions about the increasing prevalence of the diagnosis AK, or actinic keratosis, of younger people.  Are you saying -- you're nodding your head, Doctor.

A.   I recall the question.

Q.   You have to answer yes or no.

A.   Yes.  Yes, I remember the question.

Q.   Thank you.  When you see patients in their 30s with actinic keratosis, do they present typically with numerous lesions, 15 or 25, or typically fewer because they haven't been out in the sun that much in their lives?

A.   It's based on their previous sun exposure which might have been as a teenager, so it can vary, but on average, the majority of that age will have fewer, but if some patients have had multiple sunburns, they could have more.

Q.   Doctor, one final question.  Melasma or acne, are those the same things as actinic keratosis?

A.   No.

Q.   What's the difference?

A.   So actinic keratoses are precancerous lesions or precursors to skin cancers.  Acne is an inflammatory condition.  I think many are familiar with acne on the face, back, chest.  Melasma is darkening of the skin related to sun exposure and sometimes hormonal triggers like oral contraceptives or pregnancy.

Q.   And how do you treat patients with actinic keratosis in your practice?

A.   For focal treatment, I will use liquid nitrogen.  For field treatment, if they have numerous actinic keratoses and they have a good amount of sun damage, I will treat a whole

area with either topical, different types of topical creams that can be used as field treatment or photodynamic therapy.

Q. And with respect to the photodynamic therapy, just to be clear, do you use Levulan?

A. Yes.

Q. You don't just use simple laser treatments?

A. No.

MR. RAMAN: Nothing further.

MR. STAES: No questions, Judge.

THE COURT: You can step down.

(Witness excused.)

THE COURT: Members of the jury, we're going to suspend now until 10:00 o'clock tomorrow morning. Please try to get to the jury room by maybe 5 minutes to 10:00 so we can get started promptly at 10:00 o'clock. Have a nice evening.

Remember what I said. Please do not go on any of the social networks and describe your experiences. Do not go on the internet and try to do research. Don't Google any of the names you may have heard, things of that nature, and please don't discuss the case either among yourselves or with anybody else. But otherwise, have a good evening. We'll see you tomorrow.

(Proceedings heard in open court. Jury out.)

THE COURT: Everybody happy? With that, I'll see you tomorrow morning. If not, do you want to bring up anything?

If not, we'll see you at 10:00 o'clock tomorrow morning.

MR. LEE: Thank you, your Honor.

MR. STAES: Thank you.

(Proceedings adjourned from 4:55 p.m. to 10:00 a.m.)

* * * * * * *

C E R T I F I C A T E

I, Judith A. Walsh, do hereby certify that the foregoing is a true and accurate excerpt transcript of the proceedings had in the above-entitled case before the Honorable HARRY D. LEINENWEBER, one of the judges of said Court, at Chicago, Illinois, on May 1, 2017.

/s/ *Judith A. Walsh, CSR, RDR, F/CRR*          June 12, 2017

Official Court Reporter

United States District Court

Northern District of Illinois

Eastern Division