IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

       v.

OMEED MEMAR,

                Defendant.

Case No. 15 CR 345

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

On June 11, 2015, a grand jury indicted Defendant Omeed Memar ("Dr. Memar") on eight counts of health care fraud and eight counts of making false statements relating to health care matters. The indictment alleged that, between 2007 and 2013, Dr. Memar and his practice submitted claims for payment to various insurance companies that fraudulently presented cosmetic dermatological laser treatments as medically necessary destruction of pre-cancerous skin lesions. The case went to trial, and a jury convicted Dr. Memar on all counts. Now before the Court is Defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, a New Trial [ECF No. 60]. For the reasons stated herein, Defendant's Motion is denied.

# I. <u>BACKGROUND</u>

Dr. Memar is a dermatologist who runs the Academic Dermatology & Skin Cancer Institute located in Chicago, Illinois. The only doctor on staff at the Institute, Dr. Memar treats patients who suffer from a variety of skin conditions, including actinic keratosis ("AK"), a pre-cancerous skin condition resulting from prolonged sun exposure and typified by the presence of red, scaly plaques. AK is much more common in older patients. Widely accepted methods for treating AK lesions include freezing them with liquid nitrogen; applying various gels and creams to the lesions; and employing photodynamic therapy ("PDT"), which involves applying a harsh acidic agent such as aminolevulinic acid (known as ALA or Levulan) to the affected area before activating it with an Intense Pulse Light ("IPL") device. AK lesions can be persistent or sporadic, fixed or transient, and dermatologists occasionally disagree on whether a particular skin anomaly is an AK lesion. Physicians who diagnose a patient with AK lesions use the diagnosis code 702.0 and, regardless of the treatment modality employed, they bill insurance companies using a series of codes corresponding to the number of AK lesions they attempt to destroy. As relevant, the 17004 code signifies to insurance companies that the physician or his medical assistant attempted to destroy

fifteen (15) or more AK lesions on the patient. Of the available billing codes for destruction of AK lesions, the 17004 code garners the maximum insurance reimbursement.

For the eight patients referenced in the indictment, Dr. Memar initially examined their faces, recorded on their patient chart (or "secondary encounter form") a written diagnosis of 15 or more AK lesions, and marked on the form's face diagram the approximate location of the purported lesions. Dr. Memar then prescribed a series of treatments with his IPL device alone – that is, without any of the acids that in PDT are applied to the skin for activation with the IPL device - sometimes informing the patient that he or she had some spots to be taken care of but rarely (if ever) using the words "actinic keratosis" or "pre-cancerous." Five of the eight patients referenced in the indictment were in their 20s or 30s when this occurred. None of the eight recalled Dr. Memar at this time proposing or suggesting other treatment modalities known to treat AK efficaciously – such as, for example, PDT, chemical peels, or liquid nitrogen.

Once Dr. Memar prescribed an "IPL alone" treatment series, the patient typically signed a consent form stating that he or she was choosing to "try" the IPL treatment for "Photorejuvenation" and understood that there were "other

options for cosmetic skin treatment that are available." (*See,
e.g.,* Trial Tr. at 152-53.) Evidence adduced by Dr. Memar
tended to show that these consent forms were issued by the
manufacturer and then reprinted on the letterhead of his clinic,
and that some patients (not at issue in the case) with biopsy-
confirmed AK signed the form. When a patient returned to the
office for his or her IPL treatments, Dr. Memar generally did
not see them; instead, he instructed his medical assistants to
copy verbatim the diagnosis and diagram he made in the patient's
initial record into the notes and diagram corresponding to that
day's session. One of his medical assistants would then
administer the IPL treatment without counting up the patient's
lesions at the diagrammed locations.

For each patient at issue in the indictment, Dr. Memar
ultimately billed his or her insurer for multiple IPL treatments
under the 17004 code (representing the attempted destruction of
15 or more AK lesions). It was the patient's responsibility to
continue with the treatment regimen and make appointments for
the next IPL application; he or she could discontinue treatments
at any time. When Blue Cross Blue Shield ("Blue Cross")
informed Dr. Memar in January 2013 that it would no longer
reimburse for treatments of AK lesions with IPL alone because it
considered this a cosmetic procedure, Dr. Memar did not follow

up with the eight patients at issue to suggest new treatment options. To the extent any of them received a phone call from Dr. Memar's office after Blue Cross confronted him, such calls merely conveyed that IPL treatments would no longer be covered by insurance.

In its case-in-chief, the Government put on the witness stand each of the eight patients referenced in the indictment. First was Patient JJ, who testified that she was originally referred to Dr. Memar for treatment of what she understood to be a cosmetic condition - melasma. Although she could not identify Dr. Memar in the courtroom, she testified that she visited his office between February 2008 and November 2011 for a series of IPL treatments that Dr. Memar prescribed. For each such visit to his office, Patient JJ's files indicated a diagnosis of 25 scaly plaques or 25 AK lesions. (She also visited Dr. Memar's office for what she characterized as cheap Botox injections.) The Government offered a picture of Patient JJ from January 2007 in which her face appeared free and clear of any red bumps or plaques. Independently, Patient JJ saw a dermatologist, Dr. Neha Robinson, on seven dates interspersed between the dates she went to Dr. Memar. On each visit, Dr. Robinson performed a facial examination of Patient JJ; on no occasion did she diagnose Patient JJ with AK lesions or 25 scaly plaques. In

fact, two weeks before Patient JJ received an IPL treatment at
Dr. Memar's office in December 2010, Dr. Robinson examined her
face and diagnosed no AK lesions. At one point, Dr. Robinson
did diagnose Patient JJ with perioral dermatitis – a red facial
rash. All told, Dr. Memar billed Patient JJ's insurer for 11
"IPL alone" treatments as the destruction of 15 or more AK
lesions, including the December 2010 treatment and chart
underlying Counts III and XI.

The Government also called Patient PK, who as a 36 year old
was referred to Dr. Memar for acne treatment by a physician
named Dr. Oosterbaan. On November 10, 2008, Dr. Memar's office
sent a letter to Dr. Oosterbaan's office indicating that her
diagnosis was indeed acne. Charts admitted at trial showed that
Dr. Memar examined Patient PK multiple times between IPL
treatments but did not include an AK diagnosis in his charts for
those visits, mentioning only acne in some charts.
Nevertheless, Dr. Memar billed Patient PK's insurer for 25 "IPL
alone" treatments as the destruction of 15 or more AK lesions
from November 2008 through January 2013, including the May 2011
treatment and chart forming the basis of Counts IV and XII.

Patient MM was 29 years old when she went to Dr. Memar in
March 2009 concerned about the cosmetic appearance of certain
redness and scarring she had on her face. She did not recall

having dozens of red, scaly lesions on her face. Introduced into evidence was a headshot photo of her taken on March 16, 2009, showing what appeared to be a face free and clear of any red blotches or bumps. On cross-examination, Patient MM admitted that she was unsure what "scaly" patches were and that she had been wearing makeup in the photograph. The day after the photograph was taken, on March 17, 2009, she saw Dr. Memar. Patient MM testified that the two of them "discussed my problem, how I didn't like how it looked, and he suggested IPL" to "help aesthetically how it looked" and "help sort of the redness . . . skin texture, evenness." (Trial Tr. at 265.) Dr. Memar recorded in Patient MM's chart a diagnosis of 25 AK lesions, drew on the face diagram in her file lines and dots to correspond with these purported lesions, and proposed a series of "IPL alone" treatments to destroy them. From March 2009 through February 2011, Dr. Memar billed Patient MM's insurer for 13 such treatments as the destruction of 15 or more AK lesions, including the November 2010 treatment and chart underlying Counts II and X.

Unique among the eight patients referenced in the indictment, Patient KC first went to Dr. Memar for what she characterized as a medical need: She had recently gotten sunburned on vacation. (Patient KC also admitted to tanning in

salons.)  At the time of her first visit in April 2010, Patient KC was 30 years old.  She testified that her skin during that timeframe was smooth, not rough, and not scaly.  She recalled Dr. Memar telling her that she had sun damage and prescribing a series of IPL treatments for the damage.  Patient KC testified that she ultimately ceased getting IPL treatments from Dr. Memar because she felt that they were ineffectual.  From April 2010 to August 2010, Dr. Memar billed Patient KC's insurer for five such treatments as the destruction of 15 or more AK lesions, including the August 2010 treatment and chart forming the basis of Counts I and IX.

The Government also called Patient MR to the stand.  As he told it, he went to Dr. Memar for cosmetic treatment of his rosacea and broken capillaries – conditions he claimed to have had his entire life.  In May 2010 when Patient MR was 46 years old, Dr. Memar recorded in his patient chart a diagnosis of rosacea and 15 AK lesions, prescribed a series of IPL treatments, and made some markings on the face diagram in the chart indicating the locations of the purported lesions. Patient MR understood that the IPL treatments would "maybe control the nodules that are part of the condition of rosacea maybe a little bit . . . to control the redness that rosacea causes, right, and to help control the blood vessels in my nose

- 8 -

as well as to help break them up so that they get reabsorbed by the body." (Trial Tr. at 343.) From May 2010 through January 2013, Dr. Memar billed Patient MR's insurer for 23 such treatments as the destruction of 15 or more AK lesions, including the December 2011 treatment and chart underlying Counts V and XIII.

Patient HL's testimony was somewhat unique in that only she claimed to have familiarity with actinic keratosis; her father had been diagnosed with a single AK lesion on his lip, and she knew the term as a result. Patient HL was 35 years old in October 2009 when Dr. Memar first recorded in her patient file a diagnosis of 15 facial AK lesions. She testified that she did not have the telltale signs of AK lesions on her face at the time, and that her vanity guaranteed that she would have remembered if she had red, scaly plaques all over her face. On cross-examination, she admitted to using tanning salons and experiencing sunburns in the past. In contrast to what happened with Patient PK, Dr. Memar sent a note to Patient HL's referring physician indicating that he was treating her AK lesions with the IPL machine. At one point, Patient HL developed one biopsy-confirmed "lichenoid keratosis" lesion. All told, Dr. Memar billed 14 "IPL alone" treatments as the destruction of 15 or more AK lesions to Patient HL's insurer from October 2009

through February 2012, including the January 2012 treatment and chart underlying Counts VI and XIV.

The oldest patient at issue in the indictment, Patient KS, was 52 years old when she went to Dr. Memar with concerns about a single growth on her face. Although another dermatologist had assured her that it was benign, Dr. Memar diagnosed it as cancerous and excised it. After February and March 2012 follow-up appointments in which none of her patient files indicate the presence of AK lesions, Patient KS returned on March 8, 2012 for another follow-up appointment. Her chart for that day contains the first mention of "AK x 15." The patient charts corresponding to her next two visits on March 12, 2012 and April 7, 2012 also contained notes that Patient KS had "15 scaly plaques on her face" and that she received "IPL alone" treatments each time billed to her insurer as the destruction of 15 or more AK lesions. The March 12, 2012 treatment and chart were the basis for Counts VII and XV. Patient KS testified that she understood the IPL treatments as a follow-up to her prior surgery "to help with any spots" and a scar from the procedure. (Trial Tr. at 489, 497.) Years later, in 2014, Patient KS was treated with Solaraze gel – an indisputably proper method for destroying AK lesions. At various times, she also asked Dr. Memar about his Botox treatments, and he advised her against it.

Finally, Patient AG testified that she went to Dr. Memar's office for cosmetic treatment of some redness and brown spots on her face. (Patient AG had a history of tanning and sunburns.) She was similar to Patient JJ in that Dr. Robinson independently examined her face on several occasions interspersed between dates on which she went to Dr. Memar's office for IPL treatments. For example, after a year's worth of monthly IPL treatments at Dr. Memar's office, Patient AG saw Dr. Robinson, who examined her face and diagnosed no AK lesions. About four or five days after Patient AG had an IPL treatment in December 2010, Dr. Robinson again examined Patient AG's face and observed no AK lesions. On August 13, 2012 - four days before Patient AG received an IPL treatment at Dr. Memar's office for 15 AK lesions on her face – Dr. Robinson examined her face and diagnosed no AK lesions. Dr. Robinson did diagnose Patient AG with various skin conditions, but never AK lesions. All told, Patient AG received 37 "IPL alone" treatments from Dr. Memar's office, all of which he signified to insurance companies were done to destroy 15 or more AK lesions on her face. According to her testimony, Patient AG contemporaneously believed that insurance should not have been covering these IPL treatments because they were only helping her cosmetically. She ceased getting IPL treatments from Dr. Memar once she found out that

Blue Cross Blue Shield would no longer cover them and that she would have to pay $300 for each future treatment. Patient AG was 39 years old when Dr. Memar first wrote into her charts in December 2007 that she had 15 or more AK lesions on her face and prescribed a series of IPL treatments, and she received 14 such treatments *after* August 2010 – the last time Dr. Memar examined her. The June 2012 treatment and chart underlie Counts VIII and XVI.

The Government called as an expert Dr. Edward Ross, a dermatologist who practices in San Diego, California. He opined that AK is a common condition that presents as red, scaly lesions on the skin and that he typically diagnoses the condition by touch and with the naked eye. In his decades of practicing in sunny San Diego, Dr. Ross has never seen a patient in his or her 30s or younger with 15 or more AK lesions at once, other than patients afflicted by a rare genetic condition for whom any sun exposure at all is extremely dangerous. Dr. Ross testified that he only uses "IPL alone" for cosmetic purposes because the treatment only makes spots appear better cosmetically by suppressing the redness (rather than, for example, destroying the underlying AK lesion). The Government also called Dr. Robinson, the dermatologist who saw Patients JJ and AG during periods in which they received IPL treatments that

Dr. Memar billed to their insurers as the destruction of 15 or
more AK lesions.  She testified that PDT with Levulan would work
to treat AK lesions but that she does not use "simple laser
treatments," such as IPL alone, on AK lesions.  Agreeing with
Dr. Ross, Dr. Robinson did acknowledge that no standard of care
expressly prohibits treatment of AK lesions with IPL alone.

The Government also called to the stand FBI Special Agent
Ashley Davis, who interviewed Dr. Memar in 2015 incident to
execution of a search warrant at the Institute.  She testified
that she took notes during this interview and recounted several
of Dr. Memar's statements to her.  For example, Dr. Memar told
her that he always informed a patient if they had AK either by
saying, "You have actinic keratosis," or "You have a condition
that has the potential to become cancer in 10 to 15 percent of
cases." (Trial Tr. at 647-48, 657-58.)  Additionally, he
"immediately responded '17004'" when Ms. Davis asked him "what
he billed for an IPL." (*Id.* at 652-53.)  He became defensive
when Ms. Davis told him that she had interviewed many of the IPL
patients for whom he had submitted claims to insurers under the
17004 code, that they reported seeing him for treatment of
either acne or melisma, and that they were never told they had
AK or precancerous lesions. (*Id.* at 649, 658-59.)  Finally, Dr.
Memar told Ms. Davis that he gives his AK patients "a choice in

terms of the treatment method that they wanted to pursue" rather than exclusively proposing IPL alone. (*Id.* at 660.)

Finally, the Government called three of Dr. Memar's former medical assistants who testified that they performed IPL treatments on patients. All three testified that Dr. Memar instructed them for such patients to copy his initial diagnoses and diagrams verbatim into the charts for each of their IPL visits. Michelle Kline testified that she would record the presence of 15 or more scaly plaques even if she did not observe them "[b]ecause that was what was told us to write." (Trial Tr. at 215.) She also confirmed that, when patients asked for "rejuvenation and anti-aging or something to improve the tone and texture of their skin," Dr. Memar touted the benefits of IPL treatments. (*Id.* at 197.) Although she could not recall specific patients or the condition of their skin, Ms. Kline believed that the IPL treatments she was administering at Dr. Memar's behest were cosmetic procedures. She further stated that, while Dr. Memar did tell certain patients that they had AK or precancerous lesions, he never recommended just IPL treatments for those people. The testimony of Dr. Memar's second former medical assistant, Jennifer Gecas, was substantially in accord; in fact, Ms. Gecas testified that she was stressed out about integrity issues at Dr. Memar's office.

The third former employee, Christina Gutierrez, confirmed that Dr. Memar's medical assistants simply copied his initial diagnosis and diagrams when a patient came in for IPL treatments but also testified that she never treated a patient whom she believed did not have AK lesions, that she worked for Dr. Memar for 14 years, and that she did not believe that he was engaged in any wrongdoing. Ms. Gutierrez also recalled treating Patient AG and the presence of numerous AK lesions on her face. On cross-examination, Ms. Gutierrez admitted to maintaining a current business relationship with Dr. Memar's practice.

In January 2013, Dr. Memar met with individuals at Blue Cross regarding the insurance company's audit of his billing practices for Patient KS. During the meeting, Blue Cross's medical director said that she had reviewed Dr. Memar's records regarding Patient KS and believed that his use of IPL on her was cosmetic. An individual present during the meeting testified that Dr. Memar justified his use of IPL as preventative with respect to Patient KS because she had a history of cancer. He never offered that he had destroyed precancerous lesions on Patient KS. For approximately six years prior to this meeting, Dr. Memar had successfully billed Blue Cross using the 17004 code as many as 48 times per month and never fewer than 10 times per month. In December 2012, he had submitted 30 such

successful claims.  Following this meeting, Dr. Memar was only paid for three, one, one, and four 17004 claims for February, March, April, and May of 2013, respectively.  Similarly, Dr. Memar's diagnoses of AK seemed to plummet after this meeting. For example, Dr. Memar's charts for Patient PK indicate a diagnosis of "AK's x 25 face" or "AK's x 15 – face" on each of her 24 visits to his office between November 2008 through January 2013.  However, for each of her eight visits to his office subsequent to January 2013, no diagnosis of AK lesions was recorded in her patient files.

The defense, on the other hand, called eight different patients as witnesses.  These eight witnesses were generally much older than the eight patients referenced in the indictment and had serious skin conditions, including biopsy-confirmed AK lesions.  They generally recalled having scaly red skin patches that had been diagnosed as AK lesions and were familiar with actinic keratosis based on their discussions with Dr. Memar. Although all had at times received "IPL alone" treatments from Dr. Memar's office, they also had their AK lesions destroyed with other methods such as topical creams and PDT.

The defense also called Dr. David Goldberg as an expert. He testified that, while he does not use IPL alone clinically on AK patients, he has used it to treat his wife's AK lesions and

thinks it efficacious for that purpose. He claimed that the costs of utilizing IPL alone as a standard clinical treatment for AK lesions can be prohibitive. Dr. Goldberg also opined that, in an absolute sense, the number of AK patients Dr. Memar saw between 2007 and 2013 was lower than expected based on the number of patients with skin cancer he saw during that time.

Although Dr. Goldberg never himself studied or published an article about the efficacy of IPL alone in treating AK lesions, the defense on direct examination asked him to interpret several academic articles claimed to support the use of IPL alone on AK lesions. The first of these was a 2006 split-face study by Gold *et al.* that, while never recommending use of IPL alone to treat or destroy AK lesions, found unexpectedly that they responded to IPL alone in approximately 50 percent of patients (whereas PDT was effective for approximately 60 percent of patients). In a rebuttal article, Dr. Ross took issue with several methodological flaws of the 2006 study, warning practitioners that they should not extrapolate from the Gold study that treating AK patients with IPL alone is viable: "[M]any of the actinic keratosis look better," but "within the context of short contact PDT, its role as the standard of care remains unsullied." (Trial Tr. at 918-19.) This was generally consistent with Dr. Ross's trial testimony, although he noted

that no recognized standard of care forbids use of IPL alone on AK lesions. Next shown to Dr. Goldberg was a May 2008 article that also reported a reasonably close approximation between AK results achieved with IPL alone and with PDT. Then Dr. Goldberg was directed to a 2011 article, which noted that "IPL can be effective and safe for the treatment of non-aesthetic facial and neck vascular lesions," a broad term that in Dr. Goldberg's opinion encapsulates AK lesions. (*Id.* at 924-25.) However, that study noted that "IPL used for actinic keratosis is not the best tool for treating these lesions as it improves erythema but not epidermal dysplasia" – effectively confirming what Dr. Ross said in his rebuttal article and trial testimony. This piece went on to describe IPL alone as a possible alternative to traditional treatment for "patients who have numerous large superficial actinic keratosis or patients who are not eligible for surgery due to their age, health condition (heart patients, pacemaker users), or anticoagulant therapies." (*Id.* at 925-27.) Finally, Dr. Goldberg testified concerning a 2014 article that, as relevant, reported: "[W]hen used as an activator [as in PDT], IPL is a reasonable treatment option." (*Id.* at 929-30.) It said nothing about use of IPL alone on AK patients.

On cross-examination, the Government brought an article published in 2011 to Dr. Goldberg's attention. It summarized

the results of a study comparing a group of AK patients who underwent PDT with a control group comprised of AK patients who received IPL alone. The study concluded:

> Pretreatment with ALA resulted in greater improvement in global grade for photoaging, 80 percent versus 50 percent with IPL alone, which is consistent with our findings. The control group in our study achieved minimal AK clearance and photorejuvenation with the parameters used. Our results are also similar to those of Alter and colleagues, Marmer and colleagues, and Gold and colleagues confirming that ALA-PDT-IPL is more effective than IPL alone.

(Trial Tr. at 933.)

Finally, Dr. Memar himself took the stand. He did not recollect treating any of the eight patients at issue in the indictment but testified generally to his billing and treatment practices. Dr. Memar maintained throughout his trial testimony that he prescribed IPL alone with the good faith belief that it can adequately destroy AK lesions. However, on cross-examination, Dr. Memar was confronted with a 2016 presentation he gave on "Intense Pulsed Light Alone in the Treatment of Actinic Keratosis." In that presentation, Dr. Memar listed multiple effective treatment methods for AK lesions, including PDT, cryotherapy, and topical creams – but without mentioning IPL alone. Rather than disclosing that he had been using IPL alone to treat AK lesions or explaining why he considered it effective for that purpose, Dr. Memar concluded only that "IPL

alone should be studied further for effectiveness in treating actinic keratosis." (Gov't Ex. 211; *see,* Trial Tr. at 1162.) He further admitted that he never published an article on the subject, participated in a relevant study of the efficacy of IPL alone as a treatment for AK lesions, or otherwise told anyone about his claimed belief.

## II.  DEFENDANT'S RULE 29 MOTION

### A.  Legal Standard

Federal Rule of Criminal Procedure 29 permits a defendant to move for a judgment of acquittal after the verdict if he or she believes that the "evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a), (c).  A defendant's burden in challenging a conviction on sufficiency grounds is a heavy one.  *U.S. v. Curescu,* 674 F.3d 735, 741-42 (7th Cir. 2012). When reviewing the sufficiency of the evidence, the court asks "whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original) (citation omitted).  The court need not be convinced by the evidence or probe the verdict it would have rendered had it been the factfinder.  *U.S. v. Jones,* 713 F.3d 336, 340 (7th Cir. 2013).  In ruling on such a motion, the court must "bear[]

in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *U.S. v. Hagan,* 913 F.2d 1278, 1281 (7th Cir. 1990). A jury verdict will be overturned "for insufficiency of the evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *U.S. v. Stevenson,* 680 F.3d 854, 855-56 (7th Cir. 2012).

## B. Discussion

To convict Dr. Memar of any particular count of health care fraud, the Government had to present evidence sufficient to show beyond a reasonable doubt that: (1) Dr. Memar engaged in a scheme to defraud a health care benefit program; (2) he knowingly and willfully carried out the scheme; (3) he acted with the intent to defraud the health care benefit program; (4) the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) the scheme was in connection with the delivery of or payment for health care services. 18 U.S.C. § 1347; *U.S. v. Chhibber,* 741 F.3d 852, 858-59 (7th Cir. 2014). "Circumstantial evidence and inferences drawn from the scheme itself can establish specific intent to defraud." *U.S. v. Woods,* No. 11 CR 595, 2014 WL 1923998, at *2 (N.D. Ill. May 14, 2014) (citation omitted). Indeed, circumstantial

evidence corroborated with documentary evidence can establish knowing participation in a scheme to defraud. *See, U.S. v. Rucker,* 738 F.3d 878, 884 (7th Cir. 2013). To sustain a conviction for making false statements in a health care matter, the Government had to prove beyond a reasonable doubt that: (1) Dr. Memar made or caused to be made a statement; (2) the statement was false, fictitious, or fraudulent; (3) the statement was material; (4) Dr. Memar acted knowingly and willfully; (5) Dr. Memar made the statement in a matter involving a health care benefit program; and (6) he did so in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1035; *see also, U.S. v. Natale,* 719 F.3d 719, 733, 742-43 (7th Cir. 2013). In contrast to health care fraud under § 1347, there is no requirement under § 1035 of a specific intent to defraud. *See, Natale,* 719 F.3d at 738-42.

Dr. Memar does not challenge the Government's proof of several of these elements. For example, with respect to the health care fraud counts, Dr. Memar's scheme (if the Government indeed established it) was indisputably in connection with the delivery of or payment for health care services. Nor is the materiality of the alleged scheme susceptible to reasonable doubt, as representations in patient files and on bills

submitted to health care benefit programs "'have a natural tendency to influence, or are capable of influencing, the decision of' the health care benefit program." *Natale,* 719 F.3d at 737 (citing *Kungys v. U.S.,* 485 U.S. 759, 770 (1988)). As such, Dr. Memar's motion for acquittal takes issue with the Government's proof that he engaged in a scheme to defraud a health care benefit program, that he carried it out knowingly and willfully, and that he acted with the intent to defraud the program. As for the counts involving false statements in a health care matter, it is again beyond dispute that Dr. Memar made or caused to be made the statements at issue (element 1) in a matter involving a health care benefit program (element 5), which statements were material (element 3) and concerned the delivery of or payment for health care services (element 6). Thus, Dr. Memar urges that the Government failed to prove beyond a reasonable doubt that his statements were false, fictitious, or fraudulent and that he acted knowingly and willfully.

The Government's theory of the case was bipartite. First, the Government argued that the evidence established beyond a reasonable doubt that none of the patients referenced in the indictment actually had 15 or more AK lesions on their faces, something Dr. Memar knew and yet nonetheless lied about in patient files and on bills to insurers both to garner maximum

reimbursement and entice patients to his practice by providing cosmetic services at little or no cost to them. Second, the Government urged that, even assuming that Dr. Memar believed these patients did have 15 or more such lesions, Dr. Memar did not honestly believe that the IPL treatments he prescribed were destroying them. This second prong implicates two levels of generality: (i) whether Dr. Memar contemporaneously believed that IPL alone was sufficiently effective in the abstract at destroying lesions to justify billing insurance companies as he did; and (ii) whether he contemporaneously believed that his prescribed IPL treatments were efficaciously destroying the eight patients' 15 or more AK lesions. Dr. Memar argues that the evidence was insufficient to prove beyond a reasonable doubt both that the eight patients at issue in the indictment did not contemporaneously have 15 or more AK lesions on their faces and that he did not honestly believe that the IPL treatments he prescribed were at least a reasonable attempt to destroy such lesions. The Court finds that there is sufficient evidence to support both prongs of the Government's theory of the case, only one of which the jury needed to credit to convict Dr. Memar.

First, there was evidence sufficient to sustain the jury's verdict that Dr. Memar knew that none of the eight patients in the indictment, in fact, had 15 or more AK lesions on their

faces, and that he reported otherwise as part of a scheme to defraud their insurers and increase his practice's appeal to cost-conscious cosmetic patients. This is so despite the fact that some AK "symptoms" can mirror those that attend cosmetic skin conditions. The starting point is the uncontroverted testimony of the (mostly young) patients referenced in the indictment: They did not recall having 15 or more scaly red lesions on their faces when they went to Dr. Memar's office. Indeed, seven of them went to Dr. Memar for what they understood to be cosmetic conditions. With respect to those patients who were first treated with Dr. Memar's IPL machine in their 20s and 30s, the Government adduced further evidence that they did not actually have 15 or more AK lesions as diagnosed. Dr. Ross said that in his decades of practice in sunny San Diego, he had never seen a patient in their 20s or 30s with 15 or more AK lesions – barring those with rare genetic conditions not applicable here. When asked on cross-examination, Dr. Goldberg refused even to estimate how many such patients he had seen. "Deciding whether to credit simple factual testimony from these witnesses, testimony that conflicted with [Dr. Memar's] written records, . . . was well within the province of the jury." *Chhibber,* 741 F.3d at 860-61. On this score, the jury had additional evidence with respect to Patients JJ and MM in the form of facial

photographs and additional evidence with respect to Patients JJ and AG in the form of multiple intervening dermatological examinations that yielded no AK diagnoses.

Other, more generalized evidence sufficed to nudge above the reasonable doubt threshold the Government's proof that none of the patients at issue actually had 15 or more AK lesions and that Dr. Memar's reporting otherwise was part of a fraudulent scheme. Take, for example, Dr. Memar's course of conduct once Blue Cross told him in January 2013 that they would no longer reimburse IPL treatments for AK lesions. The number of Blue Cross claims for destruction of 15 or more AK lesions dramatically decreased, and no explanation was offered for why their incidence would have so precipitously declined in 2013. In particular, Patient PK had been receiving regular IPL treatments every month or two for what Dr. Memar said were AK lesions up until January 4, 2013; all her subsequent visits to Dr. Memar's office were for cosmetic treatments such as Botox. Similarly, the last time Dr. Memar billed Patient MR's insurer for destruction of 15 or more AK lesions with IPL alone was on January 10, 2013; when he returned to the office for a final visit in March 2013, Patient MR received an identical IPL treatment, which he paid for out of pocket and is described in his patient file as cosmetic. Consequently, the jury was

entitled to infer that many of the prior 17004 claims Dr. Memar submitted to Blue Cross were for cosmetic treatments, as the medically necessary treatments for destroying 15 or more AK lesions would presumably have continued after January 2013 in the form of insurance-approved liquid nitrogen, creams, chemical peels, or PDT. In fact, the eight patients at issue testified that they no longer see Dr. Memar for IPL treatments because they were told that IPL alone could no longer be billed to insurance, because they did not feel that it was helping what they understood to be their cosmetic skin problems, or because they simply elected to stop going – not because they were cleared of AK lesions or told that their pre-cancerous condition required no further treatment.

Perhaps even more damning was Dr. Memar's medical assistants' uncontroverted practice of copying by rote exactly his initial "AKs x 15 – face" diagnosis and face diagrams into each IPL patient's chart whenever he or she came in to see one of them for an IPL treatment. Although one former assistant who maintains a modest financial stake in Dr. Memar's business testified that she never performed an IPL treatment on a patient unless she saw AK lesions, two other former medical assistants testified that they performed the series of IPL treatments Dr. Memar prescribed with zero regard to whether a patient actually

had 15 or more AK lesions.  The jury was certainly entitled to weigh the testimony of these three witnesses, evaluate their credibility, and account for any potential biases.  If the jury deemed the eight patients' testimony and the circumstantial evidence to establish that they did not actually have 15 or more AK lesions, then the testimony of the medical assistants and other circumstantial evidence furnished good reason to characterize the errors in his charts as part of a pervasive fraud scheme under § 1347 (rather than incidental or typographical mistakes).  *Chhibber,* 741 F.3d at 858.  This is at least equally the case, if not more so, for the section 1035 claims, as the evidence was sufficient for the jury to find that Dr. Memar "documented these made-up medical symptoms and diagnoses in his patients' charts in order to backstop his claims for benefits from Blue Cross Blue Shield." *Chhibber,* 741 F.3d at 860 (citing *Natale,* 719 F.3d at 742).

The jury was entitled to maintain this view even after hearing the testimony of the older patients whom Dr. Memar called in his case-in-chief.  These patients all had serious skin conditions, generally remembered having scaly red spots that did not trouble them cosmetically but instead concerned them medically, had been diagnosed with AK lesions, and were familiar with the term "actinic keratosis" based on their

discussions with Dr. Memar.  To the extent the biopsy-confirmed AK patients Dr. Memar called did receive "IPL alone" treatments at his office, they also had their AK lesions destroyed with uncontroversial methods such as PDT, topical creams, chemical peels, or liquid nitrogen.  The testimony of these eight defense witnesses jibes with what Dr. Memar told FBI Agent Ashley Davis (that he always told patients if they had AK lesions and discussed various treatment options with them) and with Michelle Kline's testimony concerning how Dr. Memar handled situations when he told patients they had AK.  However, it was at odds with that offered by the eight patients at issue in the indictment, none of whom clearly recalled Dr. Memar proposing any alternative therapy or discussing AK or pre-cancerous lesions. It was no stretch for the jury to infer from this evidence that, in fact, Dr. Memar hewed to a different course of treatment when he was actually concerned about pre-cancerous AK lesions than he did when treating the eight patients at issue.

Second, even if the evidence was insufficient to prove that Dr. Memar did not believe these patients had 15 or more AK lesions on their faces at the relevant time, there was sufficient evidence that Dr. Memar did not honestly believe that IPL alone was effectively destroying them.  The jury could reasonably have coupled the scant support in the academic

literature for using IPL alone on AK lesions with Dr. Memar's own years-long silence on the issue.  Recall that the 2006 Gold split-face study, the findings and methodology of which Dr. Ross rebutted in his subsequent article, did not expressly recommend using IPL alone; that a single 2008 article noted a reasonably close approximation between the efficacy of IPL alone and PDT on AK lesions; that a 2011 study recommended IPL alone only for a rare subset of persons for whom PDT was not viable (for example, the elderly or those with pacemakers); that a 2011 article found PDT much more effective than IPL alone; that a 2014 article offered by the defense said nothing about IPL alone; that the Government pointed to another 2014 article reporting the stark inferiority of IPL alone compared to PDT in treating AK lesions; and that Dr. Memar's 2016 presentation never mentioned his own nearly decade-long experience purportedly treating AK patients with IPL alone, concluding that further study was necessary to say whether it was effective.  (Recall also the record evidence showing that Dr. Memar first began billing IPL alone as the destruction of 15 or more AK lesions in 2007.)  Far from a "unanimous" academic consensus that IPL alone efficaciously treats AK lesions, the evidence at trial showed only tepid support for doing so – with strong qualifications and admonitions against departing from PDT as the standard treatment

involving use of an IPL machine. What is more, the jury could rightly have demanded a compelling consensus in light of, as Dr. Memar tells it, the IPL machine manufacturer's consent form, which contemplates using the machine only for cosmetic purposes such as photo facials and photorejuvenation.

The jury was entitled to find Dr. Memar's evidence to the contrary unpersuasive. His expert, Dr. Goldstein, claimed to use IPL alone only to treat his wife's AK lesions; he had never clinically used it to destroy patients' AK lesions. That Dr. Memar called eight (almost exclusively older) patients with biopsy-confirmed AK lesions who underwent some IPL treatments does not advance the ball much either. None of these patients had only IPL therapy but instead partook of the menu of accepted treatments for their AK lesions. Indeed, Dr. Memar admitted on cross-examination that these patients were treated differently than the eight patients at issue in the indictment. (*See,* Trial Tr. at 1097-98.)

Even assuming *arguendo* that Dr. Memar's occasional use of IPL alone on these eight biopsy-confirmed AK patients meaningfully undercut the Government's proof that he did not have an honest belief in the abstract in the ability of IPL alone to destroy AK lesions, there was still uncontroverted evidence from which the jury could find that he lacked an honest

belief in its efficacy as to the patients at issue. Dr. Memar as a matter of course did not see them after prescribing IPL treatments that, in some cases, spanned more than a year. He never checked on these patients' conditions and never adjusted their treatment regimens over time. As noted above, he instead relied on his medical assistants to copy his initial diagnosis and administer by rote the IPL treatments. Thus, he had no way of knowing whether the IPL treatments were actually working for a particular patient in the way that he might in the abstract have reasonably believed they could work for AK lesions. *See, e.g., U.S. v. Hunt,* 521 F.3d 636, 645 (6th Cir. 2008) (finding evidence adequate to prove health care fraud under section 1347 where claims were submitted to insurer for tests that were ordered without in-person examination of patient, and where expert testified that an examination would be required to determine medical necessity of the tests); *U.S. v. Morgan,* 505 F.3d 332, 341-42 (5th Cir. 2007) (holding that reasonable jury could conclude that physician violated section 1347 when she signed prescriptions for durable medical equipment billed to Medicare without ever examining patients).

Therefore, the evidence of record – viewed in the light most favorable to the Government – was sufficient to sustain Dr. Memar's conviction on all eight counts of health care fraud and

on all eight counts of making false statements in a health care matter.  Dr. Memar's Motion is denied in relevant part.

## III.  DEFENDANT'S RULE 33 MOTION

### A. Legal Standard

Federal Rule of Criminal Procedure 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  This obtains in situations where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial."  *U.S. v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989).  Granting a Rule 33 motion is disfavored outside "the most extreme cases." *U.S. v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quotations omitted).  It is not the district court's task to "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."  *U.S. v. Reed,* 875 F.2d 107, 113 (7th Cir. 1989).  On the contrary, a new trial is warranted only if "the verdict is against the manifest weight of the evidence" – taking into account the credibility of the witnesses – and not doing so would result in a "miscarriage of justice."  *U.S. v. Washington,* 184 F.3d 653, 657-58 (7th Cir. 1999).

Due process forbids a prosecutor to urge a jury to rely on evidence that is not in the record, whether that evidence is from newspaper accounts, the Internet, or the prosecutor's own

mouth.  *Jordan v. Hepp,* 831 F.3d 837, 848 (7th Cir. 2016).  A prosecutor may not urge a jury to base its decision on information known to the prosecutor but not presented at trial.  *See, Berger v. U.S.,* 295 U.S. 78, 88 (1935) (finding it improper to imply that jury should believe witness based on evidence not presented to jury).

## B.  Discussion

Dr. Memar contends that certain statements the Government made to the jury during closing arguments deprived him of a fair trial.  Although the record evidence was clear that Dr. Memar characterized Patient KS's IPL treatments as preventive when he met with Blue Cross investigators, the Government in closing argued that he admitted to treating Patient KS with IPL solely for photorejuvenation.  The only relevant evidence of record on this point was offered by Mr. James Krupkowski, who attended the meeting between Blue Cross investigators and Dr. Memar.  As relevant, he testified:

> Q.  Now, during this discussion, what did – what, if anything, did Dr. Barnes say to Dr. Memar about the IPL treatments for [Patient KS] and whether they were medical procedures or cosmetic procedures?
>
> A.  Well, she said that it was her opinion that there were a number of cosmetic procedures which are not covered by insurance that were billed as clinical procedures that were medically necessary.  She said there were a lot of red flags.

Q.   And what, if anything, did Dr. Memar say in response to this?

A.   Well, he responded that [Patient KS] had a proven history of cancer.  It could recur.  The whole point was prevention. . . .

Q.   Did he say anything about whether he had destroyed precancerous lesions on this patient?

A.   No, no.

\*     \*     \*

Q.   What, if anything, did Dr. Barnes say to Dr. Memar about the peer reviewer's opinions as to whether the IPL treatments appeared to be cosmetic or something called rejuvenation?

A.   The peer reviewer found, it was his opinion that it was done for photorejuvenation, that it was meant to fix cosmetic blemishes on the skin as opposed to clinical problems where he would – you would need some medically necessary treatment.

Q.   Now, after Dr. Barnes told Dr. Memar about the peer reviewer's findings, what, if anything, did Dr. Memar say in response?

A.   Well, Dr. Memar disagreed with the peer reviewer's findings.  He said that, you know, his records could have been better, he could have done diagrams, but that doesn't mean that he didn't do the services that he had billed.  And he questioned the bias of the peer reviewer because Blue Cross was paying for the peer review and had requested the peer review.

(Trial Tr. at 363-64, 365-67.)  Thus, Mr. Krupkowski's testimony established only that Dr. Memar disagreed with Blue Cross's position on the cosmetic nature of IPL treatments and instead characterized Patient KS's IPL treatments as preventive.  When

he testified, Dr. Memar similarly denied admitting to Blue Cross that Patient KS received IPL treatments for photorejuvenation. (*Id.* at 1112-13, 1117.)

Nonetheless, during its initial closing argument, counsel for the Government argued on three occasions that Dr. Memar told Blue Cross that Patient KS's IPL treatments were for photorejuvenation. First, the Government used the Blue Cross discussion as a barometer of his fraudulent intent. (*See,* Trial Tr. at 1170 ("The way that he responded when he talked to Blue Cross shows you that he committed fraud. They ask him why he uses IPL, and he tells them the truth. He tells them, photo rejuvenation.").) Next, counsel made two similar statements that stressed the importance of the alleged admission to Blue Cross:

> Most importantly, though, ladies and gentlemen, one of the things to consider here is that the defendant told Blue Cross Blue Shield that the IPL treatments in connection with [Patient KS], these were for photorejuvenation. That's when he's confronted in the clinical discussion you heard about when Blue Cross seized the search and the data and they come talk to him in 2013 and they ask, "What's going on with [Patient KS]? Why is she getting IPL treatments? And the answer he gives is, "She's getting photorejuvenation." That's the truth, ladies and gentlemen. That's the first time he's asked about it, and that's what he tells them. He tells them the truth. It's a cosmetic process. It's for photorejuvenation.

*    *    *

Most importantly, though, how do you know about
knowledge and willfulness? You know because he gave
differing stories. So where are these differing
stories? The first story he tells is Blue Cross Blue
Shield. And you heard about that, that in January of
2013, he has this clinical discussion with Blue Cross
Blue Shield. And it's at that time that he tells them
the truth. He says, "I use the IPL for
photorejuvenation."

(*Id.* at 1187, 1203.)

The defense did not immediately object to any of these

three arguments concerning Dr. Memar's statements during the

Blue Cross investigative meeting. Rather, defense counsel in

closing first pointed out that, in fact, there was no record

evidence that Dr. Memar made such a statement:

I'm going to talk a little bit out of the order that I
had in my mind just based on the comments that I just
heard about the repeated – according to my colleagues,
the repeated confessions to Blue Cross Blue Shield at
this meeting that this was about photorejuvenation
with the IPL. That's all that it was about: A
confession. Even Mr. Krupkowski whom you heard from
didn't say that. He said precisely the opposite: Dr.
Memar was adamant that he had done nothing
wrong. . . . But he never hinted that there had been
any kind of a confession at that meeting. . . . If
Omeed Memar walked into Blue Cross Blue Shield with
all these people, all these witnesses and said, "You
know what, folks, I did it, I scammed you out of
hundreds of thousands of dollars for IPL treatments
for cosmetic photorejuvenation," you would have seen
that [demand] letter.

(Trial Tr. at 1206-07.) Defense counsel then turned the

prosecution's misstatement into an argument for acquittal: "In

the end, you have to be confident that the government is giving you truth beyond a reasonable doubt. And you don't have to go much further than the claim that there was a confession at Blue Cross Blue Shield. . . ." (*Id.* at 1216.)

In final rebuttal, the Government returned once to the argument, albeit this time placing less emphasis on it:

> Second, you know that the treatments were not destruction, meant to destroy precancerous actinic keratosis lesions because the defendant didn't tell [patients] that. He told them it would help redness. It would help with the rosacea. It would help – it would do photorejuvenation. It would be preventive as one of the defendant's own witnesses told you, photorejuvenation as form after form said and *as he himself admitted to Blue Cross Blue Shield when confronted and caught by surprise.*

(Trial Tr. at 1269 (emphasis added).)

Misstatements of evidence during closing argument can be improper, see, *U.S. v. Wolfe,* 701 F.3d 1206, 1214 (7th Cir. 2012), but they are rarely reversible error. *See, U.S. v. Anderson,* 450 F.3d 294, 300 (7th Cir. 2006). The Seventh Circuit employs a two-part test in assessing allegations of prosecutorial misconduct in closing arguments. First, the remarks must be considered in isolation to determine whether they are improper; second, they are evaluated in the context of the entire record to determine whether they denied the defendant a fair trial. *U.S. v. Durham,* 766 F.3d 672, 684 (7th Cir.

2014); *U.S. v. McMath,* 559 F.3d 657, 667 (7th Cir. 2009). The first is clear enough: Regardless of whether the prosecution's remarks here were deliberate or made in good faith, they were improper to the extent they misstated Mr. Krupkowski's testimony and other record evidence in the case. Whether Dr. Memar is entitled to a new trial depends on whether these remarks deprived him of a fair trial, with the following factors in mind: (1) the extent to which the comments were invited by the defense; (2) the extent to which the prejudice was ameliorated by the court's instruction(s) to the jury; (3) the defense's opportunity to counter any prejudice; and (4) the weight of the evidence supporting the conviction. *U.S. v. Mullins,* 800 F.3d 866, 872 (citing *Durham,* 766 F.3d at 685; *U.S. v. Myers,* 569 F.3d 794, 799 (7th Cir. 2009)).

With respect to the first factor, the defense does not appear to have invited the misstatements. Thus, this factor cuts in favor of a finding that Dr. Memar was denied a fair trial.

As for the second factor, the Court twice instructed the jury – both immediately before and after closing arguments – that statements made therein are not evidence. (*See, e.g.,* Trial Tr. at 1167 ("What I said about the attorneys' comments about opening statements is the same for closing statements.

The attorneys are – cannot present evidence on behalf of their clients. They can only interpret and argue and discuss what you have heard from the witness stand. It's what you heard from the witness stand, not what the lawyers say, that counts. . . . [I]f it's your group belief that what the lawyers said or say is not sustainable in the evidence, then you follow what you believe you heard during the course of the case."); *id.* at 1282 ("[T]he lawyers' statements and arguments are not evidence. If what a lawyer said is different from the evidence as you remember it, the evidence is what counts.").) In the Seventh Circuit, such instructions suffice on a defendant's motion for a new trial, particularly where the misstatement(s) did not concern the centerpiece of the Government's case. *See, e.g., McMath,* 559 F.3d at 668 ("Although the district court did not immediately instruct the jury to disregard the comment, it later instructed the jury that closing arguments were not evidence."); *U.S. v. Bowman,* 353 F.3d 546, 552 (7th Cir. 2003) ("[A]rguments are not evidence. That message was properly repeated by the judge through the jury instructions."); *cf., Hepp,* 831 F.3d at 848-49 (finding prejudice to habeas petitioner under *Strickland's* test for ineffective assistance where defense counsel did not take steps to cure prosecutor's improper vouching for witness's credibility; where "the whole case turns on witness

credibility," "standing silent while the state vouches for its witnesses cannot be justified by reliance on a generic, non-contemporaneous instruction") (citations omitted). As such, the second fair trial factor does not favor a new trial.

Third, as indicated above, counsel immediately responded to and argued against the prosecution's mischaracterization of the record. *See, Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1083 (7th Cir. 1997) ("The key to a fair trial is opportunity to use the appropriate weapons (rebuttal evidence, cross-examination, and *argument*) to meet adverse materials that come to the tribunal's attention.") (emphasis added). Indeed, defense counsel adroitly employed the Government's misstatement of Mr. Krupkowski's testimony to argue that the FBI had been sloppy all along and to undercut the credibility of the Government's case writ large, thus "attempting to use the Government's error to cast doubt on other evidence." *Woods,* 2014 WL 1923998, at *2 (denying motion for new trial where, "[d]uring closing arguments, [defense] counsel argued to the jury that half of the statements originally made concerning billing . . . were incorrect and questioned the reliability of the data presented in view of the mistakes made"); *see also, Bowman,* 353 F.3d at 552 (finding that defendant was not deprived of a fair trial where "defense

counsel's opening and closing responded to the prosecutor's comments"). As such, this was not a situation where a misstatement of evidence went unchallenged or otherwise passed without the opportunity for defense counsel to respond. While true that the prosecution once more seemingly made a similar misstatement in its final rebuttal, that instance was much briefer and uttered alongside a summary of other evidence potentially salient to the intent and willfulness issues, such as Dr. Memar's use of the IPL "photorejuvenation" consent form and his statements to Blue Cross that Patient KS's IPL treatments were preventive with respect to AK lesions. In any event, defense counsel had already taken pains to blunt the impact of the prosecution's more expansive prior misstatements. What is more, defense counsel could have objected to the Government's final rebuttal comment for assuming facts not in evidence but chose not to do so. *See, Durham,* 766 F.3d at 685 ("[N]one of the defendants objected during the prosecutor's rebuttal. As such, any lack of opportunity to take corrective action falls on the defendants."). The defense thus had every opportunity to counter any prejudice to Dr. Memar, and so the third factor militates against a new trial.

Fourth, as explored above in Section II, the weight of the evidence against Dr. Memar supported his conviction on all

counts.  More specifically, there was ample evidence besides the misstated "admission" to Blue Cross on which the jury could have based its finding that Dr. Memar's IPL prescriptions – either for Patient KS particularly or more generally for all eight patients at issue - was for photorejuvenation or other cosmetic purposes rather than the destruction of 15 or more AK lesions. Specific to Patient KS, Dr. Memar told Blue Cross that her IPL treatments were for "prevention."  Patient KS testified that she understood the IPL treatments to be a follow-up to her prior surgery "to help with any spots" and a scar from that procedure – that is, not as medically necessary attempts to destroy 15 or more pre-cancerous lesions (her single cancerous lesion had already been excised) but instead to remedy some of the cosmetic fallout from her prior surgery.  Setting aside the testimony of each of the eight patients at issue, it is worth reiterating just a few highlights from the body of circumstantial evidence presented to the jury:  Dr. Memar required all IPL patients to sign the consent form, which represented to patients that they would be receiving a cosmetic treatment; Dr. Memar offered multiple treatment alternatives when a patient had biopsy-confirmed AK lesions but only proposed IPL alone to the patients at issue (other than potentially Patient KS, whom Dr. Memar treated years later with Solaraze gel); Dr. Memar's 17004 Blue

Cross claims plummeted after the January 2013 investigative meeting; after that meeting, no one from Dr. Memar's office endeavored to tell the IPL patients that they needed to continue their AK treatments with a different modality; other behavior after the January 2013 Blue Cross meeting suggested that the patients' IPL treatments had been cosmetic all along (Patient MR, for example, paid out of pocket for his March 2013 IPL treatment, which was identical to his prior IPL treatments except that Dr. Memar's files indicate its cosmetic purpose); Dr. Memar never told anyone or published anything to the effect that he had discovered a method for treating AK lesions with just the IPL machine; and there was only limp academic support during the relevant timeframe for treating (let alone "destroying") AK lesions with IPL alone. And all this says nothing of the equally uncontroverted evidence that, once Dr. Memar initially recorded in a patient's chart that she had 15 or more AK lesions and prescribed a series of IPL treatments (sometimes lasting years), he did not examine them during the course of that series; instead, he instructed his medical assistants to copy verbatim his notes and face diagrams without regard to an IPL patient's actual appearance when they were treated.

This makes the situation unlike that in *U.S. v. Watson,* 171 F.3d 695 (D.C. Cir. 1999), where a new trial on the defendant's drug possession and distribution charges was warranted based on the prosecution's misstatements during its initial and rebuttal closing that the car in which the drugs at issue were found belonged to the defendant's girlfriend, and the only other evidence tying the defendant to the drugs was "minimal" and hotly disputed. *See, id.* at 698-702 (finding that the error "went to the heart of the government's case on a matter with respect to which the government had no other weighty evidence"). Rather, as in *McMath* where the "record reflect[ed] that the officers' credibility was solidly established apart from the prosecutor's improper [bolstering and vouching]," the relevant proof elements to which the prosecution's remarks were directed – Dr. Memar's scheme and specific intent to defraud under § 1347, and his willful false statements under § 1035 – were sufficiently established by "weighty" and compelling evidence. *McMath,* 559 F.3d at 668; *Watson,* 171 F.3d at 702. "This is not a case where the only evidence the Government presented concerning" these elements "was in error." *Woods,* 2014 WL 1923998, at *2.

Therefore, although one of the fair trial factors favors granting a new trial, the other three cut in the opposite

direction. While the Court recognizes the impropriety of the prosecution's misstatements, they did not jeopardize the fairness or integrity of his trial.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial [ECF No. 60] is denied.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: September 11, 2017